# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)(SN) |

This document relates to:

*Jessica DeRubbio, et al. v. Islamic Republic of Iran*, No. 1:18-cv-05306 (GBD) (SN)
*Horace Morris, et al. v. Islamic Republic of Iran*, No. 1:18-cv-05321 (GBD) (SN)
*Audrey Ades, et al. v. Islamic Republic of Iran*, No. 1:18-cv-07306 (GBD) (SN)
*Chang Don Kim, et al. v. Islamic Republic of Iran*, No. 1:18-cv-11870 (GBD) (SN)
*Alexander Jimenez, et al. v. Islamic Republic of Iran*, No. 1:18-cv-11875 (GBD) (SN)
*Cheryl Rivelli, et al. v. Islamic Republic of Iran*, No. 1:18-cv-11878 (GBD) (SN)
*Gordon Aamoth, Sr., et al. v. Islamic Republic of Iran*, No. 1:18-cv-12276 (GBD) (SN)
*Marinella Hemenway, et al. v. Islamic Republic of Iran*, No. 1:18-cv-12277 (GBD) (SN)
*August Bernaerts, et al. v. Islamic Republic of Iran*, No. 1:19-cv-11865 (GBD) (SN)
*Ber Barry Aron, et al. v. Islamic Republic of Iran*, No. 1:20-cv-09376 (GBD) (SN)
*Jeanmarie Hargrave, et al. v. Islamic Republic of Iran*, No. 1:20-cv-09387 (GBD) (SN)
*Paul Asaro, et al. v. Islamic Republic of Iran*, No. 1:20-cv-10460 (GBD) (SN)
*Michael Bianco, et al. v. Islamic Republic of Iran*, No. 1:20-cv-10902 (GBD) (SN)
*Nicole Amato, et al. v. Islamic Republic of Iran*, No. 1:21-cv-10239 (GBD) (SN)
*Susan M. King, et al. v. Islamic Republic of Iran*, No. 1:22-cv-05193 (GBD) (SN)

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL FINAL JUDGMENT AS TO LIABILITY FOR THE *KING* PLAINTIFFS AND FOR DAMAGES ON BEHALF OF MOVING PLAINTIFFS

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Alexander Greene, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel:     (212) 278-1000
Fax:    (212) 278-1733
Email:  jgoldman@andersonkill.com
            bstrong@andersonkill.com
            agreene@andersonkill.com

*Attorneys for Plaintiffs*

Dated:  New York, New York
            May 18, 2023

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.     **INTRODUCTION**.................................................................................... 1

II.    **PRELIMINARY STATEMENT** ............................................................ 5

    a.    Orders ......................................................................................... 5

    b.    Related Cases ............................................................................. 6

    c.    Jurisdiction ................................................................................ 8

        i.    This Court Has Subject Matter Jurisdiction Over Iran ............... 9

        ii.    This Court has Personal Jurisdiction over Iran ......................... 11

        iii.    Service by Mail Was Not Successful ........................................ 12

        iv.    Iran Was Served Via Diplomatic Means ................................... 16

    d.    The Clerk Properly Entered Default Against Iran. ................................ 20

    e.    Motions for Substitution/Notices of Amendment ................................ 25

        i.    Motions for Substitution ........................................................ 25

        ii.    Notices of Amendment .......................................................... 26

III.    **JUDGMENT AGAINST IRAN AS TO LIABILITY FOR THE *KING*
PLAINTIFFS SHOULD BE ENTERED** ........................................... 26

    a.    Legal Standard for FSIA Default Judgment As to Liability ................. 26

    b.    Plaintiffs State a Cause of Action Under the Terrorism Exception
of the FSIA ............................................................................. 29

    c.    There Is a Factual Basis for Establishing Liability ............................ 30

        i.    United States' Recognition of Iran as a State Sponsor of
Terrorism.......................................................................... 32

        ii.    Iran's Training and Support of al Qaeda Operatives .................. 33

        iii.    Iran's Support for the September 11, 2001 Attacks.................... 36

    d.    Plaintiffs Have Established Material Support and Causation............... 38

        i.    Plaintiffs Have Established Material Support............................ 38

        ii.    Plaintiffs Have Proved Causation ........................................... 40

    e.    The Basis for Judgment as to Liability Has Been Established............. 41

IV.    **JUDGMENTS AS TO DAMAGES SHOULD BE ENTERED** ................... 41

    a.    Damages – Governing Law ......................................................... 42

        i.    Background ........................................................................ 42

    b.    Solatium Damages................................................................... 44

i

## TABLE OF CONTENTS
### (*continued*)

Page

      i.      Individuals Not Named in the Complaint (Notices of
Amendment) Entitled to Solatium Damages ............................................ 46

c.       Pain and Suffering Damages For Estates ............................................. 47

d.       Personal Injury Damages - Pain and Suffering ................................. 48

i.       P.A.P.D. Officer William "Will" Jimeno ............................................ 49

\- Jimeno's Life Before 9/11 - .................................................................. 51

\- September 11 - ....................................................................................... 52

\- The Hospital Saves Will's Life - ........................................................ 61

\- Physical Rehabilitation - ...................................................................... 63

\- Jimeno's Continuing Physical Disability - .......................................... 64

\- Psychological Effects - .......................................................................... 65

\- The Court Should Award P.O. Jimeno *Twenty-Five Million Dollars* in
Personal Injury Damages - ................................................................... 67

\- Economic Damages in the Amount of *$3,181,931* Should be Awarded to
Plaintiff Jimeno - ................................................................................ 70

      ii.      P.A.P.D. Sergeant John McLoughlin ................................................... 70

\- John McLoughlin's Life Before 9/11 – ............................................... 71

\- September 11 - ....................................................................................... 73

\- The Hospital Saves John's Life - ....................................................... 80

\- Outpatient Treatment - ......................................................................... 82

\- John's Continuing Disability - ............................................................ 84

\- Psychological Effects - .......................................................................... 86

\- The Court Should Award Sergeant McLoughlin *Twenty-Eight Million
Dollars* in Personal Injury Damages - ................................................ 87

\- Economic Damages in the Amount of *$2,660,711* Should be Awarded to
Plaintiff McLoughlin - ......................................................................... 89

e.       Punitive Damages ................................................................................... 90

f.       Prejudgment Interest .............................................................................. 91

V.       **CONCLUSION** .................................................................................. **92**

a.       Liability ................................................................................................... 92

b.       Damages .................................................................................................. 93

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashton v. al Qaeda Islamic Army*,
  02-CV-6977 (GBD)(SN) ................................................................ *passim*

*Baker v. Socialist People's Libyan Arab Jamahirya*,
  775 F. Supp. 2d 48 (D.D.C. 2011) ........................................................ 91

*Bauer v. Al Qaeda Islamic Army*,
  02-CV-7236 (GBD)(SN) ................................................................ *passim*

*Belkin v. Islamic Republic of Iran*,
  667 F. Supp. 2d 8 (D.D.C. 2009) ........................................................ 44

*Blais v. Islamic Republic of Iran*,
  459 F. Supp. 2d 40 (D.D.C. 2006) ...................................................... 40

*Estate of Bland v. Islamic Republic of Iran*,
  831 F. Supp. 2d 150 (D.D.C. 2011) .................................................... 44

*Com. Bank of Kuwait v. Rafidain Bank*,
  15 F.3d 238 (2d Cir. 1994) .............................................................. 27

*Dammarell v. Islamic Republic of Iran*,
  281 F. Supp. 2d 105 (D.D.C. 2003), *vacated on other grounds*, 404 F. Supp.
  2d 261 (D.D.C. 2005) .................................................................... 44

*Est. of Heiser v. Islamic Republic of Iran*,
  466 F. Supp. 2d 229 (D.D.C. 2006) .................................................... *passim*

*Fain v. Islamic Republic of Iran*,
  856 F. Supp. 2d 109 (D.D.C. 2012) .................................................... 28

*Flatow v. Islamic Republic of Iran*,
  999 F. Supp. 1 (D.D.C. 1998) .......................................................... 40

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
  582 F.3d 393 (2d Cir. 2009) ............................................................ 11

*Gates v. Syrian Arab Republic*,
  580 F. Supp. 2d 53 (D.D.C. 2008) .................................................... 39

docs-100577682.1

**TABLE OF AUTHORITIES**
**(*continued*)**

<b>Page(s)</b>

*Haim v. Islamic Republic of Iran*,
  784 F. Supp. 2d 1 (D.D.C. 2011) .............................................................28

*Harrison v. Republic of Sudan*,
  882 F. Supp. 2d 23 (D.D.C. 2012) ...........................................................28

*Havlish, et al. v. Bin Laden, et al.*,
  No. 03-CV-9848-GBD, ECF No. 294 (S.D.N.Y. Dec. 22, 2011) ................... *passim*

*Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*,
  131 F. Supp. 2d 248 (D.D.C. 2001) ..........................................................27

*In re Islamic Republic of Iran Terrorism Litig.*,
  659 F. Supp. 2d 31 (D.D.C. 2009) .......................................................38, 40

*Leibovitch v. Syrian Arab Republic*,
  25 F. Supp. 3d 1071 (N.D. Ill. 2014) .......................................................29

*Murphy v. Islamic Republic of Iran*,
  740 F. Supp. 2d 51 (D.D.C. 2010) ...........................................................28

*O'Brien v. Islamic Republic of Iran*,
  853 F. Supp. 2d 44 (D.D.C. 2012) ...........................................................69

*O'Neill. Hoglan, et al. v. Islamic Rep. of Iran, et al.*,
  1:11-cv-07550-GBD, ECF No. 112 (Aug. 31, 2015) .................................... *passim*

*Owens v. Republic of Sudan*,
  2011 WL 5966900 (D.D.C. Nov. 28, 2011) ...............................................35

*Owens v. Republic of Sudan*,
  826 F. Supp. 2d 128 (D.D.C. 2011) .............................................30, 33, 35, 38

*Peterson v. Islamic Republic of Iran*,
  264 F. Supp. 2d 46 (D.D.C. 2003) ...........................................................28

*Reed v. Islamic Republic of Iran*,
  845 F. Supp. 2d 204 (D.D.C. 2012) ..............................................20, 26, 40

*Rimkus v. Islamic Republic of Iran*,
  575 F. Supp. 2d 181 (D.D.C. 2008) ..........................................................27

*Rimkus v. Islamic Republic of Iran*,
  750 F. Supp. 2d 163 (D.D.C. 2010) .....................................................28, 29

*Roeder v. Islamic Republic of Iran*,
  333 F.3d 228 (D.C. Cir. 2003) ................................................................26

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Rux v. Republic of Sudan*,
495 F. Supp. 2d 541 (E.D. Va. 2007) ......................................................40

*Samantar v. Yousuf*,
560 U.S. 305 (2010)..............................................................................8

*In re Sept. 11 Litig.*,
802 F.3d 314 (2d Cir. 2015)..................................................................91

*Shapiro v. Republic of Bolivia*,
930 F.2d 1013 (2d Cir. 1991).........................................................11, 20

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan*,
262 F. Supp. 2d 217 (S.D.N.Y. 2003), *amended sub nom. Smith ex rel. Est. of Smith v. Islamic Emirate of Afghanistan*, No. 01 CIV.10132 (HB), 2003 WL 23324214 (S.D.N.Y. May 19, 2003)..................................................26, 27

*Surette v. Islamic Republic of Iran*,
231 F. Supp. 2d 260 (D.D.C. 2002) .......................................................44

*In re Terrorist Attacks on Sept. 11, 2001*,
741 F.3d 353 (2d Cir. 2013)..................................................................10

*In re Terrorist Attacks on September 11, 2001*,
03-md-1570......................................................................... *passim*

*Ungar v. Islamic Republic of Iran*,
211 F. Supp. 2d 91 (D.D.C. 2002) ...................................................26, 27

*United States v. Quintieri*,
306 F.3d 1217 (2d Cir. 2002)................................................................10

*Valore v. Islamic Republic of Iran*,
478 F. Supp. 2d 101 (D.D.C. 2007) .......................................................27

*Valore v. Islamic Republic of Iran*,
700 F. Supp. 2d 52 (D.D.C. 2010) ...................................................12, 44

*Weinstein v. Islamic Republic of Iran*,
175 F. Supp. 2d 13 (D.D.C. 2001) ...................................................27, 28

*Weinstein v. Islamic Republic of Iran*,
184 F. Supp. 2d 13 (D.D.C. 2002) .........................................................27

*Wultz v. Islamic Republic of Iran*,
864 F. Supp. 2d 24 (D.D.C. 2012) .........................................................28

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

**Statutes**

18 U.S.C. § 2339A ........................................................................................................39, 40

28 U.S.C. § 1605 ........................................................................................................ *passim*

28 U.S.C. § 1608 ........................................................................................................ *passim*

49 U.S.C. § 40101 ................................................................................................................91

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852
   (2016) ...........................................................................................................................9, 10

**Other Authorities**

Fed. R. Civ. P. 50(a) ..........................................................................................................26

Fed. R. Civ. P. 55(a) ..........................................................................................................20

White House, *President Donald J. Trump Is Holding the Iranian Regime
   Accountable for Its Global Campaign of Terrorism*,
   https://trumpwhitehouse.archives.gov/briefings-statements/president-donald-j-
   trump-holding-iranian-regime-accountable-global-campaign-terrorism/ ..............................32

docs-100577682.1

## I.       INTRODUCTION

Plaintiffs in the above-captioned actions, by and through their counsel, Anderson Kill P.C., respectfully submit this Memorandum of Law in support of their Motion for Partial Final Judgment as to both Liability and Damages against the Defendant Islamic Republic of Iran ("Iran"), pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.

This action arises out of the events of September 11, 2001, during which members of the al Qaeda[1] terrorist network hijacked four commercial airliners and used those planes as weapons in coordinated terrorist attacks on the United States (the "September 11th Attacks").  Plaintiffs in the above-captioned cases are comprised of individuals injured and personal representatives and eligible family members of individuals killed in the September 11th Attacks.

First, all of the Plaintiffs in *Susan M. King, et al. v. Islamic Republic of Iran*, No. 1:22-cv-05193 (GBD) (SN) ("*King*") now respectfully request entry of judgments by default against Iran on the issue of liability, solely as to the Plaintiffs' substantive causes of action established under the FSIA's state sponsor of terrorism exception, codified at 28 U.S.C. § 1605A(c).[2]

Significantly, on the issue of liability, this Court has already entered judgment against Iran for identical claims in multiple related matters consolidated before this Court under *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570, based on a full evidentiary record and hearing pursuant to the FSIA.  The extension of those rulings to all plaintiffs is both appropriate

---

[1] Arabic words and names are spelled differently in various sources. Plaintiffs have strived for consistency as much as possible, but original spellings are maintained in quoted sources.

[2] As discussed below, the issues presented by this application related to the request for default judgment on liability against Iran as to the instant Plaintiffs' claims under the state sponsor of terrorism exception have already been addressed by this Court in proceedings in related litigation in *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570. While the within Plaintiffs are not at this time seeking judgment on their other claims asserted in the complaint, they reserve their right to do so in the future, if necessary.

and consistent with the specific objectives that prompted the Judicial Panel for Multidistrict Litigation to centralize each of those proceedings before this Court.

The *King* Plaintiffs and the plaintiffs in the above-captioned 2018 matters seek a judicial determination that service was properly effectuated upon Iran in accordance with 28 U.S.C. § 1608.

Further, for the reasons set forth below, the statements contained in the declaration of Jerry S. Goldman, Esq., with exhibits appended thereto and tendered under seal ("Goldman Declaration"), which is being filed contemporaneously with this memorandum of law, as well as those set forth in prior motions for liability and damages made on behalf of the *O'Neill* plaintiffs, certain plaintiffs in the above-referenced matters who are identified in Exhibits A-1 to A-7 (collectively, "Exhibits A"),[3] Exhibits B-1 to B-12 (collectively, "Exhibits B"),[4] and Exhibit G (the "Personal Injury Plaintiffs") annexed to the Goldman Declaration (the plaintiffs in Exhibits

---

[3] The plaintiffs listed in annexed Exhibits A are the immediate relatives of a 9/11 decedent, which includes individuals who are not named in the complaint but are entitled to receive judgments for solatium based on their relationship to the 9/11 decedent and were added by Notice of Amendment. As noted below, each personal representative has provided the undersigned counsel with proof that he or she has been appointed by the court as the personal representative of the deceased relative, except in the case specifically identified herein and in the Goldman Declaration, where a party has filed a petition to be so appointed, which petition, on information and belief, is unopposed, but has not yet been granted.  Goldman Declaration at ¶¶ 4-14.

[4] The plaintiffs listed in annexed Exhibits B are the personal representatives of a 9/11 decedent. In all cases, they are submitting claims for compensatory damages as a result of the 9/11 decedent's death.  Those personal representatives who, at this time, are seeking to solely recover compensatory damages for pain and suffering are specifically reserving their right to seek an additional judgment, at a future date, for economic damages, based upon then-submitted evidence.  As noted below, each personal representative has provided the undersigned counsel with proof that he or she has been appointed by the court as the personal representative of the decedent, except in the case specifically identified herein and in the Goldman Declaration, where a party has filed a petition to be so appointed, which petition, on information and belief, is unopposed, but has not yet been granted. Goldman Declaration at ¶¶ 4-14, 20-28.

A, Exhibits B, and Exhibit G are the "Moving Plaintiffs"), by and through their counsel, Anderson Kill P.C., respectfully move this Court for an Order:

(1)     determining that service of process was properly effected upon Iran in accordance with 28 U.S.C. § 1608(a) for sovereign defendants and 28 U.S.C. § 1608(b) for agencies and instrumentalities of sovereign defendants;[5] AND,

(2)     awarding the Plaintiffs identified in Exhibits A judgments against Iran as to damages in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, *O'Neill*, and other cases; AND,

(3)     awarding solatium damages to those Plaintiffs identified in Exhibits A in the amounts of $12,500,000 per spouse, $8,500,000 per parent, $8,500,000 per child, and $4,250,000 per sibling, as set forth in annexed Exhibits A; AND**,**

(4)     awarding compensatory damages judgment to the Personal Injury Plaintiffs against Iran for pain and suffering commensurate with the injuries sustained during the September 11, 2001 terrorist attacks, in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases (and factoring in an upward departure on damages values based on the indelible impact of the September 11, 2001 terrorist attacks); AND,

(5)     awarding the estates of the 9/11 decedents, through the personal representatives and on behalf of all survivors and all legally entitled beneficiaries and family member of such 9/11 decedents, as identified by the Plaintiffs set forth in Exhibits B, compensatory damages for pain and suffering in the same per estate amount

---

[5] This only applies for the plaintiffs in this motion in the above-referenced 2018 matters, and for all plaintiffs in *Susan M. King, et al. v. Islamic Republic of Iran*, No. 1:22-cv-05193 (GBD) (SN).

previously awarded by this Court regarding other estates of decedents killed in the September 11th attacks, as set forth in Exhibits B; AND,

(6)     awarding compensatory damages to certain Plaintiffs identified in Exhibits B for decedents' pain and suffering in an amount of $2,000,000 per estate, as set forth in annexed Exhibits B; AND,

(7)     awarding the estates of the 9/11 decedents, through their personal representatives and on behalf of all survivors and all legally entitled beneficiaries and family member of such 9/11 decedent, as identified in Exhibits B, and the Personal Injury Plaintiffs identified in Exhibit G, an award of economic damages in the amount as set forth in Exhibits B and Exhibit G; AND,

(8)     awarding the Plaintiffs identified in Exhibits A, Exhibits B, and Exhibit G prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; AND,

(9)     granting the Plaintiffs identified in Exhibits A, Exhibits B, and Exhibit G permission to seek punitive damages, economic damages, and other appropriate damages, at a later date; AND,

(10)     granting permission for all other Plaintiffs in these actions not appearing in Exhibits A, Exhibits B, and Exhibit G to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND,

(11)     granting to the Plaintiffs in Exhibits A, Exhibits B, and Exhibit G such other and further relief as this Honorable Court deems just and proper.

4

This motion is made only on behalf of all Plaintiffs in *Susan M. King, et al. v. Islamic Republic of Iran*, No. 1:22-cv-05193 (GBD) (SN) as to liability, and damages on behalf of the Moving Plaintiffs (who already have liability judgments).

## II.   PRELIMINARY STATEMENT

### a.  Orders

This motion is being submitted in accordance with various procedural orders entered by this Court, and the form of this motion and the relief requested herein are intended to comply with various orders of this Court, including the following:

a. The Court's January 24, 2017 Order, ECF No. 3435,[6] requiring that "[a]ll further motions for final judgment against any defaulting defendant shall be accompanied by a sworn declaration attesting that the attorney has (1) complied with the due diligence safeguards [referenced in Section II.D. of the January 23, 2017 letter from the Plaintiffs' Executive Committee (ECF No. 3433)] and (2) personally verified that no relief has previously been awarded to any plaintiff included in the judgment (or, if relief has been awarded, the nature of that relief)."

b. The Court's October 14, 2016 Order, ECF No. 3363, concerning the amounts of solatium damage awards.

c. The Court's October 14, 2016 Order, ECF No. 3362, related to the cases captioned as *Bauer v. Al Qaeda Islamic Army*, 02-CV-7236 (GBD)(SN) and *Ashton v. al Qaeda Islamic Army*, 02-CV-6977 (GBD)(SN).

d. The Court's October 28, 2019 Order, ECF No. 5234, setting forth updated procedural rules.

e. The Court's October 28, 2019 Order, ECF No. 5338, setting forth the scheduling order.

f. The Court's May 5, 2022 Order, ECF No. 7963, setting forth procedures for filing expert reports submitted in support of default judgments.

---

[6] All ECF numbers are to the MDL docket unless stated otherwise.

### b. Related Cases

Relying on evidence and arguments[7] submitted by plaintiffs in *In re Terrorist Attacks on September 11, 2001*, 03-md-1570, the consolidated multidistrict litigation arising out of the September 11th Attacks, this Court on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of certain of the *Havlish*, *Ashton*, *O'Neill*, *Federal Insurance*, and *Hoglan* groups of plaintiffs against Iran. *See, e.g.*, ECF Nos. 2516, 3014, 3016, 3020-23. Subsequently, other liability findings were made for additional *O'Neill* Plaintiffs. After granting the *Havlish* Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* plaintiffs and their decedents. Upon the submissions of the *Havlish* plaintiffs, on October 3, 2012, this Court found, among other things, that "Plaintiffs may recover for [, inter alia,] solatium . . . in an action under Section 1605A. 28 U.S.C. § 1605A(c)(4). In such an action, . . . family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010). This Court also found that the following solatium awards for family members are appropriate, as an upward departure from the framework in *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

---

[7] In each of the Orders of Judgment regarding plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December 15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

| Relationship of Decedent | Solatium Award |
| --- | --- |
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

ECF No. 2623 at 4.

The Court has applied the same solatium values to claims of other solatium plaintiffs in *Burnett* (ECF Nos. 3666, 4023, 4126, 4146, 4175, 5061, 5062, 5087, 5138, and 5356) and other solatium plaintiffs in other cases coordinated in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation. *See, e.g.*, ECF Nos. 3175 at 2, 3300 at 1, 3358 at 9, 3363 at 16, 3399, and 3977 at 7.

In that same decision in *Havlish*, this Court also found that Plaintiffs are entitled to punitive damages under the FSIA in an amount of 3.44 multiplied by their compensatory damages award. ECF No. 2623 at 5. The Court has applied that 3.44 multiplier also to judgments in *Ashton*. *See* ECF No. 3175 at 3 (Report and Recommendation to apply 3.44 punitive multiplier); *see also* ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier). The Court applied the 3.44 punitive multiplier to the compensatory awards previously awarded in *Burnett*. ECF No. 3666. However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF Nos. 3358 at 11-16, 3363 at 28. Judge Daniels adopted Magistrate Judge Netburn's Report and Recommendation in its entirety. ECF Nos. 3383 at 2, 3384 at 6.

7

In the *Havlish* decision, this Court also found that prejudgment interest was warranted for the Plaintiffs' solatium damages. ECF No. 2623 at 5.  The *Havlish* plaintiffs sought application of a 4.96% interest rate, which the magistrate judge recommended (ECF No. 2619 at 13-14) and Judge Daniels adopted (ECF No. 2623 at 5). In *Ashton*, plaintiffs sought, and the magistrate judge recommended, application of a statutory nine percent simple interest rate for prejudgment interest. ECF No. 3175 at 7-8.  Judge Daniels adopted the magistrate judge's report and recommendation and applied the nine percent interest rate in multiple instances in *Ashton* and *Bauer*. *See* ECF Nos. 3229 at 2, 3300 at 1, 3341 at 1. However, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent rate for prejudgment interest should be applied to all solatium claims, ECF Nos. 3358 at 17-20, 3363 at 28-29. Judge Daniels adopted Magistrate Judge Netburn's *Hoglan* Report and Recommendation in its entirety and applied an interest rate of 4.96 percent per annum, compounded annually. ECF Nos. 3383 at 2, 3384 at 6.  The Court applied that interest rate, 4.96 percent per annum, to the awards to other plaintiffs in *Burnett*.

### c.  Jurisdiction

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state in federal court." *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989)).  Under the architecture of the FSIA, foreign states are presumed to be immune from suit in the courts of the United States unless one of the FSIA's enumerated exceptions to immunity applies.  *See* 28 U.S.C. §§ 1605-1605A; *Samantar*, 560 U.S. at 305.  As discussed below, this Court previously held that subject matter jurisdiction exists for claims against Iran for injuries resulting from the September 11th Attacks under two separate, independent provisions of the FSIA: the state sponsor of terrorism exception (28 U.S.C.

§ 1605A) and the noncommercial tort exception (28 U.S.C. § 1605(a)(5)).[8] *See* the Court's

Findings of Fact and Conclusions of Law in *Havlish, et al. v. Bin Laden, et al.*, No. 03-CV-9848-

GBD, ECF No. 294 (S.D.N.Y. Dec. 22, 2011), hereinafter referred to as "Court Findings," ECF

No. 294 at 46 ¶ 4.  Those rulings control in relation to the present application, although this

motion focuses solely on the jurisdictional grant and substantive remedies provided under

Section 1605A.

Also as discussed below, Plaintiffs have properly effected service of process on Iran,

perfecting personal jurisdiction over Iran under the FSIA as well.

### i.   This Court Has Subject Matter Jurisdiction Over Iran

In *Havlish*, this Court concluded that it had subject matter jurisdiction for claims against

Iran for injuries resulting from the September 11th Attacks pursuant to both Sections 1605A and

1605(a)(5) of the FSIA, explaining as follows:

> Subject matter jurisdiction exists if the defendant's conduct falls
> within one of the specific statutory exceptions to immunity.  *See* 28
> U.S.C. §§ 1330(a) and 1604.  *Owens v. Republic of Sudan*, 2011
> WL 5966900 (D.D.C. Nov. 28, 2011).  Here, this Court has
> jurisdiction because service was proper and defendants' conduct
> falls within both the "state sponsor of terrorism" exception set
> forth in 28 U.S.C. § 1605A and the "noncommercial tort"
> exception of § 1605(a)(5).

*See* Court Findings, ECF No. 294 at 46 ¶ 4.

As to liability against Iran through the present motion, the Plaintiffs seek the entry of

default judgment in relation to their substantive causes of action arising under Section 1605A,

---

[8] On September 28, 2016, Congress enacted the Justice Against Sponsors of Terrorism Act, Pub.
L. No. 114-222, 130 Stat. 852 (2016) ("JASTA"), which provides an additional ground for
jurisdiction and liability against Iran. *See Id.* § 3. However, because an application for default
judgment as to the Moving Plaintiffs' claims under the new statute would potentially raise issues
not previously addressed by the Court, the Moving Plaintiffs are not seeking judgment in
reliance on JASTA, but reserve their right to do so in the future, if necessary.

9

and thus only the exception to immunity provided under that section is implicated by the instant proceedings.[9]  With respect to the issue of jurisdiction, this Court's prior holding that Section 1605A provides a proper basis for subject matter jurisdiction for claims against Iran for injuries resulting from the September 11th Attacks is controlling, and the issue need not, and indeed should not, be re-litigated in the context of the present default judgment proceedings.  *In re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d 353, 358 (2d Cir. 2013) (explaining that the "September 11 cases were centralized in part in order to 'prevent inconsistent pretrial rulings'"); *see also United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (internal quotations omitted) ("when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case").

As in *Havlish*, the Plaintiffs' actions assert claims against Iran for wrongful deaths and personal injuries resulting from the September 11th Attacks, based on Iran's extensive sponsorship of al Qaeda during the decade leading up to the attacks, and direct support for critical aspects of the 9/11 operation itself.  The evidentiary and factual record supporting the present claims is identical to the record this Court considered in issuing judgment against Iran in *Havlish*.  Given the similarity of the present claims to those present in *Havlish*, there can be no dispute that this Court's ruling that Section 1605A provided a proper basis for jurisdiction for the claims against Iran in *Havlish* also controls as to the wrongful death and personal injury claims asserted in the Plaintiffs' actions.

For example, this Court has also previously extended the ruling in *Havlish* to apply to other related actions against Iran pending in the *In re Terrorist Attacks on September 11, 2001*

---

[9] As indicated previously, the Plaintiffs reserve their right to pursue judgments against Iran on their additional common law and statutory theories of liability, and to invoke jurisdiction pursuant to Section 1605(a)(5) and JASTA in that context.

multidistrict litigation, namely *Hoglan*, *Federal Insurance*, *Ashton*, *Burnett*, and *O'Neill*. *Hoglan, et al. v. Islamic Rep. of Iran, et al.*, 1:11-cv-07550-GBD, ECF No. 112 (Aug. 31, 2015); *In re Terrorist Attacks on September 11, 2001*, ECF Nos. 3021 (*Ashton*), 3022 (*O'Neill*), 3020 (*Federal Ins.*) (Aug. 31, 2015), 3443 (*Burnett*) (Jan. 31, 2017).

For all the foregoing reasons, this Court's prior ruling concerning the applicability of Section 1605A to claims against Iran for injuries resulting from the September 11th Attacks applies with full force to the claims asserted against Iran in the Plaintiffs' matters.

### ii.   This Court has Personal Jurisdiction over Iran

"Under the FSIA, . . . personal jurisdiction equals subject matter jurisdiction plus valid service of process." *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991).[10] Service under the FSIA is governed by 28 U.S.C. Section 1608(a).

The Complaints were filed as follows (and summons duly issued):

| NAME OF CASE | CASE NO. | DATE FILED |
|---|---|---|
| *Jessica DeRubbio, et al. v. Islamic Republic of Iran* | No. 1:18-cv-05306 (GBD) (SN) | 06/15/2018 |
| *Horace Morris, et al. v. Islamic Republic of Iran* | No. 1:18-cv-05321 (GBD) (SN) | 06/14/2018 |
| *Audrey Ades, et al. v. Islamic Republic of Iran* | No. 1:18-cv-07306 (GBD) (SN) | 08/13/2018 |
| *Chang Don Kim, et al. v. Islamic Republic of Iran* | No. 1:18-cv-11870 (GBD) (SN) | 12/17/2018 |
| *Alexander Jimenez, et al. v. Islamic Republic of Iran* | No. 1:18-cv-11875 (GBD) (SN) | 12/17/2018 |
| *Cheryl Rivelli, et al. v. Islamic Republic of Iran* | No. 1:18-cv-11878 (GBD) (SN) | 12/17/2018 |
| *Gordon Aamoth, Sr., et al. v. Islamic Republic of Iran* | No. 1:18-cv-12276 (GBD) (SN) | 12/28/2018 |
| *Marinella Hemenway, et al. v. Islamic Republic of Iran* | No. 1:18-cv-12277 (GBD) (SN) | 12/28/2018 |

---

[10] The Second Circuit has ruled that foreign states are not persons within the meaning of the Due Process Clause. *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 399-401 (2d Cir. 2009). Thus, the personal jurisdiction analysis as to Iran does not include a due process component.

| *August Bernaerts, et al. v. Islamic Republic of Iran* | No. 1:19-cv-11865 (GBD) (SN) | 12/27/2019 |
|---|---|---|
| *Ber Barry Aron, et al. v. Islamic Republic of Iran* | No. 1:20-cv-09376 (GBD) (SN) | 11/09/2020 |
| *Jeanmarie Hargrave, et al. v. Islamic Republic of Iran* | No. 1:20-cv-09387 (GBD) (SN) | 11/10/2020 |
| *Paul Asaro, et al. v. Islamic Republic of Iran* | No. 1:20-cv-10460 (GBD) (SN) | 12/10/2020 |
| *Michael Bianco, et al. v. Islamic Republic of Iran* | No. 1:20-cv-10902 (GBD) (SN) | 12/23/2020 |
| *Nicole Amato, et al. v. Islamic Republic of Iran* | No. 1:21-cv-10239 (GBD) (SN) | 12/01/2021 |
| *Susan M. King, et al. v. Islamic Republic of Iran,* | No. 1:22-cv-05193 (GBD) (SN) | 06/21/2022 |

Following the filing of the complaints and the issuance of a summons, the Plaintiffs herein secured a translation of the complaint, summons, and notice of suit into Farsi, and took steps to serve Iran.

Service was effectuated as set forth below.

### iii.  Service by Mail Was Not Successful

Service on Iran could not be effected under 28 U.S.C. § 1608(a)(1) because the United States and Iran do not have any special arrangement for service of process, nor is service permitted by any applicable international convention under the provisions of subsection (2). *See Valore*, 700 F. Supp. 2d at 70.

Accordingly, the Plaintiffs first attempted to serve Iran in accordance with Section 1608(a)(3) of the FSIA.  Section 1608(a)(3) provides that:

> if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned.

12

The Southern District of New York's Clerk's Office Foreign Mailing Instructions provide plaintiffs with instructions for service by U.S. Postal Service ("USPS"), FedEx, or DHL. *See* United States District Court for the Southern District of New York Clerk's Office Foreign Mailing Instructions at 2.

On the dates set forth in the tables below,[11] the instant Plaintiffs attempted to utilize USPS for service under § 1608(a)(3).[12] Pursuant to the Southern District of New York's Clerk's Office Foreign Mailing Instructions, plaintiffs prepared an envelope along with the requisite service documents for the Clerk of the District Court as prescribed, and delivered a Service Packet[13] to the Clerk. The Clerk of Court, in accordance with the Southern District of New York's Clerk's Office Foreign Mailing Instructions and 28 U.S.C. § 1608 (a)(3), attempted to serve the Service Packet on Iran via USPS. As set forth in Jerry S. Goldman's Affidavits in Support of Requests for Clerk's Default (the "Goldman Default Affidavits"), Iran refused to accept the Service Packet. Because service by mail could not be effected within 30 days, Plaintiffs proceeded to effect service by diplomatic channels pursuant to § 1608(a)(4). *See* Jerry S. Goldman's Affidavits of Service (the "Goldman Affidavits of Service"); *see also* Goldman Default Affidavits; *see also* Clerk's Certificates of Mailing, all as identified in the following tables:

---

[11] Because only the plaintiffs in this motion in the above-referenced 2018 matters, and all plaintiffs in *Susan M. King, et al. v. Islamic Republic of Iran*, No. 1:22-cv-05193 (GBD) (SN), seek a determination that service of process was properly effected upon Iran in accordance with 28 U.S.C. § 1608(a) for sovereign defendants and 28 U.S.C. § 1608(b) for agencies and instrumentalities of sovereign defendants, only those cases are included in the below tables.

[12] FedEx and DHL were not delivering packages to Iran at the time service was attempted to be effectuated.

[13] The Service Packet, in addition to pre-paid postage, contained an envelope, two copies of the summons and complaint and notice of suit, together with a translation in the official language of the foreign state (Farsi), and a certification of same.

**CASE NAME:**   *Jessica DeRubbio, et al. v. Islamic Republic of Iran*

CASE NO:                                            No. 1:18-cv-05306 (GBD) (SN)

DATE OF ATTEMPTED SERVICE BY MAIL:                 06/29/2018

CLERK'S CERTIFICATE OF MAILING-ECF NO.:            ECF No. 21 (docket for individual case)

GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.:              ECF No. 49 (docket for individual case)

GOLDMAN DEFAULT AFFIDAVIT-ECF NO.:                 ECF No. 54 (docket for individual case)

**CASE NAME:**   *Horace Morris, et al. v. Islamic Republic of Iran*

CASE NO:                                            No. 1:18-cv-05321 (GBD) (SN)

DATE OF ATTEMPTED SERVICE BY MAIL:                 06/29/2018

CLERK'S CERTIFICATE OF MAILING-ECF NO.:            ECF No. 22 (docket for individual case)

GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.:              ECF No. 55 (docket for individual case)

GOLDMAN DEFAULT AFFIDAVIT-ECF NO.:                 ECF No. 53 (docket for individual case)

**CASE NAME:**   *Audrey Ades, et al. v. Islamic Republic of Iran*

CASE NO:                                            No. 1:18-cv-07306 (GBD) (SN)

DATE OF ATTEMPTED SERVICE BY MAIL:                 08/21/2018

CLERK'S CERTIFICATE OF MAILING-ECF NO.:            ECF No. 12 (docket for individual case)

GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.:              ECF No. 31 (docket for individual case)

GOLDMAN DEFAULT AFFIDAVIT-ECF NO.:                 ECF No. 33 (docket for individual case)

**CASE NAME:**   *Chang Don Kim, et al. v. Islamic Republic of Iran*

CASE NO:                                            No. 1:18-cv-11870 (GBD) (SN)

DATE OF ATTEMPTED SERVICE BY MAIL:                 02/20/2019

CLERK'S CERTIFICATE OF MAILING-ECF NO.:            ECF No. 16 (docket for individual case)

GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.:              ECF No. 4690

14

| | | |
|---|---|---|
| | GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4805 |
| **CASE NAME:** | *Alexander Jimenez, et al. v. Islamic Republic of Iran*<br>CASE NO: | No. 1:18-cv-11875 (GBD) (SN) |
| | DATE OF ATTEMPTED SERVICE BY MAIL:<br>CLERK'S CERTIFICATE OF MAILING-ECF NO.: | 02/20/2019<br>ECF No. 12 (docket for individual case) |
| | GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.:<br>GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4685<br>ECF No. 4803 |
| **CASE NAME:** | *Cheryl Rivelli, et al. v. Islamic Republic of Iran*<br>CASE NO: | No. 1:18-cv-11878 (GBD) (SN) |
| | DATE OF ATTEMPTED SERVICE BY MAIL:<br>CLERK'S CERTIFICATE OF MAILING-ECF NO.: | 02/20/2019<br>ECF No. 10 (docket for individual case) |
| | GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.:<br>GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4692<br>ECF No. 4811 |
| **CASE NAME:** | *Gordon Aamoth, Sr., et al. v. Islamic Republic of Iran*<br>CASE NO: | No. 1:18-cv-12276 (GBD) (SN) |
| | DATE OF ATTEMPTED SERVICE BY MAIL:<br>CLERK'S CERTIFICATE OF MAILING-ECF NO.: | 02/20/2019<br>ECF No. 10 (docket for individual case) |
| | GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.:<br>GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4686<br>ECF No. 4797 |
| **CASE NAME:** | *Marinella Hemenway, et al. v. Islamic Republic of Iran*<br>CASE NO: | No. 1:18-cv-12277 (GBD) (SN) |
| | DATE OF ATTEMPTED SERVICE BY MAIL:<br>CLERK'S CERTIFICATE OF MAILING-ECF NO.: | 02/20/2019<br>ECF No. 10 (docket for individual case) |
| | GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.:<br>GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4694<br>ECF No. 4801 |
| **CASE NAME:** | *Susan M. King, et al. v. Islamic Republic of Iran*<br>CASE NO: | No. 1:22-cv-05193 (GBD) (SN) |
| | DATE OF ATTEMPTED SERVICE BY MAIL: | 08/31/2022 |

CLERK'S CERTIFICATE OF MAILING-ECF NO.:    ECF No. 14 (docket for individual case)

GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.:    ECF No. 8887

GOLDMAN DEFAULT AFFIDAVIT-ECF NO.:    ECF No. 8927

### iv. Iran Was Served Via Diplomatic Means

Under 28 U.S.C. § 1608(a)(4),

> if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

Therefore, pursuant to 28 U.S.C. § 1608(a)(4), after service by mail was rejected, the instant Plaintiffs delivered to the Clerk of the Court for the U.S. District Court for the Southern District of New York the following items: cover letter, a cashier's check in the amount of $2,275.00 payable to the U.S. Embassy Bern, copies of the Complaint in English, copies of the Complaint in Farsi, Notice of Suit in English, Notice of Suit in Farsi, Summons in English, Summons in Farsi, Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602, Civil Cover Sheet, Affidavits from translators, and a U.S. Airbill (from FedEx) (collectively, "Service Documents").[14]  The Clerk was requested to transmit these documents to the United States State Department in Washington, D.C.  *Id.*  In accordance with the statute and the protocol of the Department of State, it would, in turn, transmit one copy of the papers through diplomatic

---

[14] Also included were United States Airbills from the State Department to the Embassy in Bern and back, and to the Southern District of New York Clerk.

channels to the foreign state and send the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted. Plaintiffs met all of those requirements in this case. *See* Goldman Default Affidavits and Goldman Affidavits of Service.

As set forth in the below tables, the Clerk of the Court mailed the Service Documents to the Secretary of State, Director of Consular Services, Office of Policy Review and Inter-Agency Liaison, United States Department of State for service on Iran under 28 U.S.C. § 1608 (a)(4). *See* Goldman Default Affidavits and Goldman Affidavits of Service.

As evidenced by letter from Jared Hess, Attorney Advisor, Overseas Citizens Services, Office of Legal Affairs, United States Department of State, to Ruby J. Krajick, Clerk of Court, service was effectuated on Iran as set forth in the below tables,[15] when the U.S. Department of State, assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran, delivered the Service Documents to the Iranian Ministry of Foreign Affairs under cover of diplomatic notes, whose number is in the below tables. Pursuant to 28 U.S.C. § 1608(c)(1), in instances of service under § 1608(a)(4), service shall be deemed to have been made "as of the date of transmittal indicated in the certified copy of the diplomatic note." *See* Goldman Default Affidavits, Goldman Affidavits of Service, Clerk's Certificates, and Diplomatic Notes.

| **CASE NAME:** | *Jessica DeRubbio, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:18-cv-05306 (GBD) (SN) |
| | DATE OF DELIVERY OF THE DIPLOMATIC NOTE AND SERVICE DOCUMENTS: | 09/26/2018 |
| | DIPLOMATIC NOTE NO: | 1080-IE |
| | CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 24 (docket for individual case) |

---

[15] Because only the plaintiffs in this motion in the above-referenced 2018 matters, and all plaintiffs in *Susan M. King, et al. v. Islamic Republic of Iran*, No. 1:22-cv-05193 (GBD) (SN), seek a determination that service of process was properly effected upon Iran in accordance with 28 U.S.C. § 1608(a) for sovereign defendants and 28 U.S.C. § 1608(b) for agencies and instrumentalities of sovereign defendants, only those cases are included in the below tables.

17

| | |
|---|---|
| GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 49 (docket for individual case) |
| GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 54 (docket for individual case) |

**CASE NAME:** *Horace Morris, et al. v. Islamic Republic of Iran*

| | |
|---|---|
| CASE NO: | No. 1:18-cv-05321 (GBD) (SN) |
| DATE OF DELIVERY OF THE DIPLOMATIC NOTE AND SERVICE DOCUMENTS: | 09/26/2018 |
| DIPLOMATIC NOTE NO: | 1077-IE |
| CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 25 (docket for individual case) |
| GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 55 (docket for individual case) |
| GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 53 (docket for individual case) |

**CASE NAME:** *Audrey Ades, et al. v. Islamic Republic of Iran*

| | |
|---|---|
| CASE NO: | No. 1:18-cv-07306 (GBD) (SN) |
| DATE OF DELIVERY OF THE DEPLOMATIC NOTE AND SERVICE DOCUMENTS: | 12/06/2018 |
| DIPLOMATIC NOTE NO: | 1113-IE |
| CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 19 (docket for individual case) |
| GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 31 (docket for individual case) |
| GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 33 (docket for individual case) |

**CASE NAME:** *Chang Don Kim, et al. v. Islamic Republic of Iran*

| | |
|---|---|
| CASE NO: | No. 1:18-cv-11870 (GBD) (SN) |
| DATE OF DELIVERY OF THE DEPLOMATIC NOTE AND SERVICE DOCUMENTS: | 06/11/2019 |
| DIPLOMATIC NOTE NO: | 1038-IE |
| CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 18 (docket for individual case) |
| GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 4690 |
| GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4805 |

**CASE NAME:** *Alexander Jimenez, et al. v. Islamic Republic of Iran*

| | |
|---|---|
| CASE NO: | No. 1:18-cv-11875 (GBD) (SN) |

|  | |
|---|---|
| DATE OF DELIVERY OF THE DEPLOMATIC NOTE AND SERVICE DOCUMENTS: | 06/11/2019 |
| DIPLOMATIC NOTE NO: | 1043-IE |
| CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 14 (docket for individual case) |
| GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 4685 |
| GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4803 |

**CASE NAME:** *Cheryl Rivelli, et al. v. Islamic Republic of Iran*

| | |
|---|---|
| CASE NO: | No. 1:18-cv-11878 (GBD) (SN) |
| DATE OF DELIVERY OF THE DEPLOMATIC NOTE AND SERVICE DOCUMENTS: | 06/11/2019 |
| DIPLOMATIC NOTE NO: | 1040-IE |
| CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 12 (docket for individual case) |
| GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 4692 |
| GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4811 |

**CASE NAME:** *Gordon Aamoth, Sr., et al. v. Islamic Republic of Iran*

| | |
|---|---|
| CASE NO: | No. 1:18-cv-12276 (GBD) (SN) |
| DATE OF DELIVERY OF THE DIPLOMATIC NOTE AND SERVICE DOCUMENTS: | 06/11/2019 |
| DIPLOMATIC NOTE NO: | 1044-IE |
| CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 12 (docket for individual case) |
| GOLDMAN AFFIDAVIT OF SERVICE-ECF NO: | ECF No. 4686 |
| GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4797 |

**CASE NAME:** *Marinella Hemenway, et al. v. Islamic Republic of Iran*

| | |
|---|---|
| CASE NO: | No. 1:18-cv-12277 (GBD) (SN) |
| DATE OF DELIVERY OF THE DEPLOMATIC NOTE AND SERVICE DOCUMENTS: | 06/11/2019 |
| DIPLOMATIC NOTE NO: | 1045-IE |
| CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 12 (docket for individual case) |
| GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 4694 |
| GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 4801 |

**CASE NAME:** *Susan M. King, et al. v. Islamic Republic of Iran*

| | |
|---|---|
| CASE NO: | No. 1:22-cv-05193 (GBD) (SN) |

19

| | |
|---|---|
| DATE OF DELIVERY OF THE DIPLOMATIC NOTE AND SERVICE DOCUMENTS: | 01/09/2023 |
| DIPLOMATIC NOTE NO: | 1152-IE |
| CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 15 (docket for individual case) |
| GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 8887 |
| GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 8927 |

Based on the foregoing, Plaintiffs filed an Affidavit of Service confirming service was effected on Iran on the dates of the diplomatic notes as set forth above.

Because service upon Iran was proper, and Section 1605A of the FSIA provides subject matter jurisdiction for the Plaintiffs' claims against Iran, this Court has personal jurisdiction over Iran.  *Shapiro*, 930 F.2d at 1020; *see also Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 209 (D.D.C. 2012).  *See* Goldman Declaration ¶ 17.

### d.  The Clerk Properly Entered Default Against Iran.

Iran did not file any responsive pleading or otherwise defend the suit.  Rule 55(a) of the Federal Rules of Civil Procedure, provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  *Id*.

The within Plaintiffs requested, on the dates set forth in the tables below, that the Clerk enter default against Iran because:

- Iran was obligated to "serve an answer or other responsive pleading to the complaint within sixty days after service [was effectuated]." 28 U.S.C. § 1608(d);

- Iran was served on the dates set forth in the table; and

- More than sixty (60) days elapsed since service, and Iran failed to file an answer or other responsive pleading, or take any other steps to defend this action.

Upon the Plaintiffs' application, the Clerk issued a Certificate of Default as set forth below.

As Iran failed to timely answer or move in response to the duly served summons and complaint, the Clerk of the Court properly issued a Certificate of Default.

| **CASE NAME:** | *Jessica DeRubbio, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:18-cv-05306 (GBD) (SN) |
| | DATE OF SERVICE: | 09/26/2018 |
| | DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 01/18/2019 |
| | ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 53 (docket for individual case) |
| | DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 01/18/2019 |
| | ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 55 (docket for individual case) |

| **CASE NAME:** | *Horace Morris, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:18-cv-05321 (GBD) (SN) |
| | DATE OF SERVICE: | 09/26/2018 |
| | DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 01/24/2019 |
| | ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 52 (docket for individual case) |
| | DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 01/24/2019 |
| | ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 54 (docket for individual case) |

| **CASE NAME:** | *Audrey Ades, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:18-cv-07306 (GBD) (SN) |
| | DATE OF SERVICE: | 12/06/2018 |
| | DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 02/27/2019 |
| | ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 32 (docket for individual case) |
| | DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 02/28/2019 |
| | ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 34 (docket for individual case) |

| **CASE NAME:** | *Chang Don Kim, et al. v. Islamic Republic of Iran* |
|---|---|

|  |  |
|---|---|
| CASE NO: | No. 1:18-cv-11870 (GBD) (SN) |
| DATE OF SERVICE: | 06/11/2019 |
| DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
| ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4804 |
| DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
| ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4817 |

**CASE NAME:** *Alexander Jimenez, et al. v. Islamic Republic of Iran*

|  |  |
|---|---|
| CASE NO: | No. 1:18-cv-11875 (GBD) (SN) |
| DATE OF SERVICE: | 06/11/2019 |
| DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
| ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4802 |
| DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
| ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4818 |

**CASE NAME:** *Cheryl Rivelli, et al. v. Islamic Republic of Iran*

|  |  |
|---|---|
| CASE NO: | No. 1:18-cv-11878 (GBD) (SN) |
| DATE OF SERVICE: | 06/11/2019 |
| DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
| ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4810 |
| DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 08/14/2019 |
| ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 23 (docket for individual case) |

**CASE NAME:** *Gordon Aamoth, Sr., et al. v. Islamic Republic of Iran*

|  |  |
|---|---|
| CASE NO: | No. 1:18-cv-12276 (GBD) (SN) |
| DATE OF SERVICE: | 06/11/2019 |
| DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
| ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4796 |

|  | DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
|---|---|---|
|  | ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4806 |

| **CASE NAME:** | *Marinella Hemenway, et al. v. Islamic Republic of Iran* | |
|---|---|---|
|  | CASE NO: | No. 1:18-cv-12277 (GBD) (SN) |
|  | DATE OF SERVICE: | 06/11/2019 |
|  | DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
|  | ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4800 |
|  | DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 08/13/2019 |
|  | ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 4814 |

| **CASE NAME:** | *August Bernaerts, et al. v. Islamic Republic of Iran* | |
|---|---|---|
|  | CASE NO: | No. 1: 19-cv-11865 (GBD) (SN) |
|  | DATE OF SERVICE: | 6/29/2020 |
|  | DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 07/09/2021 |
|  | ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 6924 |
|  | DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 07/09/2021 |
|  | ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 6933 |

| **CASE NAME:** | *Ber Barry Aron, et al. v. Islamic Republic of Iran* | |
|---|---|---|
|  | CASE NO: | No. 1:20-cv-09376 (GBD) (SN) |
|  | DATE OF SERVICE: | 04/14/2021 |
|  | DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 07/09/2021 |
|  | ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 6932 |
|  | DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 07/09/2021 |

docs-100577682.1

ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT:                    ECF No. 6937


**CASE NAME:**    *Jeanmarie Hargrave, et al. v. Islamic Republic of Iran*

| | |
|---|---|
| CASE NO: | No. 1:20-cv-09387 (GBD) (SN) |
| DATE OF SERVICE: | 04/14/2021 |
| DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 07/08/2021 |
| ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 6911 |
| DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 07/09/2021 |
| ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 6922 |


**CASE NAME:**    *Paul Asaro, et al. v. Islamic Republic of Iran*

| | |
|---|---|
| CASE NO: | No. 1:20-cv-10460 (GBD) (SN) |
| DATE OF SERVICE: | 04/21/2021 |
| DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 07/20/2021 |
| ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 6971 |
| DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 07/20/2021 |
| ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 6972 |


**CASE NAME:**    *Michael Bianco, et al. v. Islamic Republic of Iran*

| | |
|---|---|
| CASE NO: | No. 1:20-cv-10902 (GBD) (SN) |
| DATE OF SERVICE: | 04/21/2021 |
| DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 07/09/2021 |
| ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 6930 |
| DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 07/09/2021 |
| ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 6936 |


**CASE NAME:**    *Nicole Amato, et al. v. Islamic Republic of Iran*

| | | |
|---|---|---|
| | CASE NO: | No. 1:21-cv-10239 (GBD) (SN) |
| | DATE OF SERVICE: | 06/15/2022 |
| | DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 08/19/2022 |
| | ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 8411 |
| | DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 08/24/2022 |
| | ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 8443 |

| | | |
|---|---|---|
| **CASE NAME:** | *Susan M. King, et al. v. Islamic Republic of Iran* | |
| | CASE NO: | No. 1:22-cv-05193 (GBD) (SN) |
| | DATE OF SERVICE: | 01/09/2023 |
| | DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 03/14/2023 |
| | ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 8926 |
| | DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 03/15/2023 |
| | ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 8928 |

### e. Motions for Substitution/Notices of Amendment

#### i. Motions for Substitution

Certain of the within Plaintiffs filed motions to substitute parties as set forth below.

| | | |
|---|---|---|
| **CASE NAME:** | *Susan M. King, et al. v. Islamic Republic of Iran* | |
| | CASE NO: | No. 1:22-cv-05193 (GBD) (SN) |
| | DATE OF MOTION TO SUBSTITUTE: | 04/20/2023 |
| | ECF NO. OF MOTION TO SUBSTITUTE: | ECF No. 9035 |
| | DATE OF ORDER GRANTING MOTION TO SUBSTITUTE: | 04/24/2023 |
| | ECF NO. OF ORDER GRANTING MOTION TO SUBSTITUTE: | ECF No. 9048 |

PLAINTIFF:          Linda Pohlmann, as the Personal Representative of the Estate of William Howard Pohlmann, deceased, and on behalf of all survivors and all legally entitled beneficiaries and family members of William Howard Pohlmann

Denyse D. Kruse as Personal Representative of the Estate of Raenell Ketcham, deceased, the late parent of Douglas D. Ketcham

#### ii. Notices of Amendment

Certain of the Plaintiffs herein, as set forth in Exhibits A and Exhibits F-1 to F-6 (collectively, "Exhibits F") to the Goldman Declaration, have been added pursuant to a Notice of Amendment.

### III. JUDGMENT AGAINST IRAN AS TO LIABILITY FOR THE *KING* PLAINTIFFS SHOULD BE ENTERED

#### a. Legal Standard for FSIA Default Judgment As to Liability

Under the FSIA, "[n]o judgment by default shall be entered by a court of the United States or of a State against a foreign state…unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Reed*, 845 F. Supp. 2d at 211 (considering evidence presented by plaintiffs after satisfaction of jurisdictional requirements); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court still has an obligation to satisfy itself that plaintiffs have established a right to relief."). To prevail in a FSIA default proceeding, a plaintiff must present a "legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 98 (D.D.C. 2002). This standard is the same standard used for granting judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). *See, e.g.*, *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 223 (S.D.N.Y. 2003), *amended sub*

26

*nom. Smith ex rel. Est. of Smith v. Islamic Emirate of Afghanistan*, No. 01 CIV.10132 (HB),

2003 WL 23324214 (S.D.N.Y. May 19, 2003) (adopting standard used in *Ungar* and finding Iraq

liable for September 11, 2001 terrorist acts).

Courts within the Second Circuit have noted that the proper standard for establishing

liability under the FSIA should be "less than normally required," *Id.* at 223, and that a plaintiff

needs merely to demonstrate a *prima facie* case to obtain a judgment of liability in a FSIA case.

*See Ungar*, 211 F. Supp. 2d at 98.  A plaintiff meets its burden of proof by affidavit or similar

evidence, *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002), and a

court considering entry of default judgment may "accept plaintiffs' uncontroverted evidence as

true." *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 193 (D.D.C. 2008); *Valore v.

Islamic Republic of Iran*, 478 F. Supp. 2d 101, 106 (D.D.C. 2007).

Section 1608(e) does not require a new evidentiary hearing to establish liability when a

foreign sovereign is in default.  *See Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d

Cir. 1994) (finding evidence in form of affidavits and exhibits sufficient to satisfy § 1608(e));

*Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 262

(D.D.C. 2001) (accepting as true plaintiffs' uncontroverted factual allegations supported by

documentary and affidavit evidence without evidentiary hearing).  Instead, a plaintiff seeking a

default judgment under the FSIA may meet its burden by entering into evidence certified

transcripts of relevant testimony presented in a previous proceeding.  *See Weinstein v. Islamic

Republic of Iran*, 175 F. Supp. 2d 13, 22 (D.D.C. 2001) (adopting findings by relying on

affidavit testimony and certified transcript from another proceeding is sufficient to establish

Iran's provision of material support and resources to al Qaeda).  In lieu of filing affidavits from

witnesses that testified in a previous case, plaintiffs may submit certified copies of the witnesses'

transcript from the previous case to establish particular facts.  *See Weinstein*, 175 F. Supp. 2d at 22; *see also Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) ("when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced'" (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011)); *see also Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 10 (D.D.C. 2011) (taking judicial notice of sworn testimony and documentary evidence presented in prior proceedings which arose out of the 1995 Gaza strip bombing at issue in *Haim*).

Additionally, taking into account the "multiplicity of FSIA-related litigation," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010), courts acknowledge that "a FSIA court may 'take judicial notice of related proceedings and records in cases before the same court.'" *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 29 (D.D.C. 2012), quoting *Valore*, 700 F.Supp.2d at 59.

Although judicial notice of findings of fact does not itself establish the truth of such facts under the Federal Rules of Evidence, "'the FSIA does not require this Court to re-litigate issues that have already been settled' in previous decisions. . . . Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) (quoting *Heiser*, 466 F. Supp. 2d at 264  (taking judicial notice of findings of fact and conclusions of law made in *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003), which also arose out of the 1983 Beirut bombing); *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109 (D.D.C. 2012) (same); *Heiser*, 466 F. Supp. 2d at 263 (taking judicial notice of

factual findings made in case brought against same defendants for damages arising from the

same 1996 attack on Khobar Towers); *see also Leibovitch v. Syrian Arab Republic*, 25 F. Supp.

3d 1071 (N.D. Ill. 2014) (taking judicial notice of findings of fact in related proceedings arising

out of terrorist attack where defendants failed to appear or otherwise plead).

> [T]he statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack. . . . Rather, the requirement was intended to ensure that the courts give proper deference to the political branches' predominant role in foreign affairs by pausing to ensure the validity of their actions before undertaking the substantial step of piercing sovereign immunity and entering judgment against a foreign state.  Mindful of these interests, courts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them.

*Rimkus*, 750 F. Supp. 2d at 172.

### b.  **Plaintiffs State a Cause of Action Under the Terrorism Exception of the FSIA**

In addition to establishing a basis for subject matter jurisdiction for the *King* Plaintiffs'

claims against Iran, Section 1605A also provides a substantive cause of action imposing liability

against Iran for the Moving Plaintiffs' injuries.  Pursuant to Section 1605A(c), a country

designated as a State Sponsor of Terrorism shall be liable to a national of the United States for

personal injury or death caused by that country's provision of material support or resources.  *See*

§ 1605A(a)(1), (c).  As the District Court for the District of Columbia explained in 2011:

> A straightforward reading of § 1605A(c) is that it creates a federal cause of action for four categories of individuals:  a national of the United States, a member of the U.S. armed forces, a U.S. Government employee or contractor, or a legal representative of such a person . . . . The cause of action is further described as "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official employee or agent of

29

that foreign state, for which the courts of the United States may
maintained jurisdiction under this section for money damages.

*Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 153 (D.D.C. 2011) ("liability under section

1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met") (citing

*Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 460 (D.P.R.

2010)).

Section 1605A(c) authorizes the recovery of economic damages, solatium, pain and

suffering, and punitive damages.

### c. There Is a Factual Basis for Establishing Liability

The *King* Plaintiffs seek entry of default judgment as to liability against Iran based on

Iran's provision of material support to al Qaeda and direct support for, and sponsorship of, the

September 11th Attacks.  As set forth below, Iran provided material support and resources to al

Qaeda and bin Laden both directly and through Iran surrogate, Hezbollah.  The support provided

by Iran assisted in, and contributed to, the preparation and execution of the plans that culminated

in the September 11th Attacks.  Without Iran's active and enthusiastic support, al Qaeda could

never have carried out those attacks.

The government of Iran has a long history of providing material support and resources to

terrorist organizations targeting the United States and its citizens, including al Qaeda.  In 2011,

in the *Havlish* case and as part of the *In re Terrorist Attacks on September 11, 2001 MDL*, this

Court specifically outlined Iran's longstanding role in the development of the al Qaeda network

and direct support for the September 11th Attacks themselves.[16]  This Court's factual findings in

the *Havlish* proceeding are supported by an array of government reports, including the Final

---

[16] *See Havlish v. Bin Laden*, No. 03-CV-9848-GBD, ECF No. 294 (S.D.N.Y. Dec. 22, 2011).

Report of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission").  Among other relevant findings as to Iran, the 9/11 Commission concluded that Iran forged a cooperation agreement with al Qaeda in the early 1990's, pursuant to which Iran provided a range of training and assistance to al Qaeda for nearly a decade leading up to the September 11th Attacks; and that Iran facilitated the travel of senior al Qaeda figures and several of the future 9/11 hijackers into Afghanistan, thereby directly assisting al Qaeda in the planning and execution of the September 11th Attacks.  *See* The 9/11 Commission Report (the "9/11 Final Report") at 60-61, 240-241.[17]

The *King* Plaintiffs submit that the 9/11 Commission's findings as to the nature and scope of Iran's sponsorship of al Qaeda are themselves sufficient to support entry of judgment by default in these proceedings.  Moreover, these findings were further corroborated by affidavits of terrorism experts Dietrich L. Snell, Dr. Daniel L. Byman, Janice L. Kephart, Dr. Patrick Clawson, Claire M. Lopez, Dr. Bruce D. Tefft, Dr. Ronen Bergman, and Kenneth Timmerman, submitted of record in the *Havlish* default proceedings.  Citing both the government reports of record and the corroborating affidavits, this Court recognized Iran's critical role in enabling and facilitating al Qaeda's terrorist activities, concluding, for example, that "there is clear and convincing evidence pointing to the involvement on the part of Hezbollah and Iran in the 9/11 attack, especially as it pertains to travel facilitation and safe haven."  *See* Court Findings, ECF No. 294 at 35 ¶ 213 (citing Ex. 5, Snell Aff. ¶ 23).  "Iran's facilitation of the hijackers' terrorist travel operation constituted material support – indeed direct support – for al Qaeda 9/11 attacks," Court Findings, ECF No. 294 at 39 ¶ 234 (citing Ex.4, Kephart Aff. ¶ 66), and that evidence of

---

[17] The 9/11 Commission Report, http://govinfo.library.unt.edu/911/report/911Report.pdf, accessed February 27, 2023.

record "leaves no doubt that al Qaeda and the official Iranian Regime at the highest levels have been acting in concert to plot and execute attacks against the United States since early 1990s." Court Findings, ECF No. 294 at 41 ¶ 247 (citing Ex. 6, Lopez-Tefft Aff. ¶ 352).

### i.  United States' Recognition of Iran as a State Sponsor of Terrorism

The United States Government has recognized and condemned Iran's support of terrorist attacks for over thirty (30) years.  Since January 19, 1984, Iran has been designated by the United States Secretary of State as a State Sponsor of Terrorism on the basis that it "repeatedly provided support for acts of international terrorism."  U.S. Department of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited October 18, 2021). As a designated State Sponsor of Terrorism, Iran is subject to restrictions on exports and imports, prohibitions on economic assistance and financial and other restrictions.  On March 16, 1995, in response to Iranian support of international terrorism, President Clinton issued Executive Order 12957, which prohibited United States involvement with petroleum development in Iran.  On May 6, 1995, President Clinton strengthened these sanctions by signing Executive Order 12959, pursuant to the International Emergency Economic Powers Act (50 USCS § 1701).  President Clinton imposed additional restrictions on Iran pursuant to Executive Order 13059 on August 19, 1997.  This Order reflected the Executive Branch's intent to prohibit virtually all trade and investment activities with Iran by United States persons.

To be sure, Iran's status as a state sponsor of terrorism remains firmly in place today; as quoted in a White House statement dated April 8, 2019, President Donald Trump confirmed: "The Iranian regime is the leading state sponsor of terror.  It exports dangerous missiles, fuels conflicts across the Middle East, and supports terrorist proxies."[18]

---

[18] White House, *President Donald J. Trump Is Holding the Iranian Regime Accountable for Its Global Campaign of Terrorism*, https://trumpwhitehouse.archives.gov/briefings-

**ii.** <u>Iran's Training and Support of al Qaeda Operatives</u>

This Court's prior findings of fact affirm that Iran "has engaged in, and supported,

terrorism as an instrument of foreign policy, virtually from the inception of its existence after the

Iranian Revolution in 1979."  Court Findings, ECF No. 294 at 6 ¶ 1.  Beginning in the mid-to-

late 1980s, Iran began formulating contingency plans for anti-United States terrorist operations.

*Id.* at 15 ¶ 70. As this Court already has found:

> In the early 1990s, casting aside the historic bitterness between the
> Sunni and Shi'a sects of Islam, Sudanese religious-political leader
> Hassan al Turabi and Iran's political leadership and intelligence
> agencies established close ties, including paramilitary and
> intelligence connections, beginning a united Sunni-Shiite front
> against the United States and the West. . . .

> While Osama bin Laden and al Qaeda were headquartered in
> Sudan in the early 1990s, Hassan al Turabi fostered the creation of
> a foundation and alliance for combined Sunni and Shi'a opposition
> to the United States and the West, an effort that was agreed to and
> joined by Osama bin Laden and Ayman al Zawahiri, leaders of al
> Qaeda, and by the leadership of Iran. . . .

Court Findings, ECF No. 294 at 16 ¶¶ 72-73.  Though Iran and Hezbollah are largely Shiite and

al Qaeda is Sunni, according to the 9/11 Final Report, "[t]he relationship between al Qaeda and

Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to

cooperation in terrorist operations."  *Id.* at 15 ¶ 69 (citing 9/11 Final Report at 61).

In 1991, bin Laden relocated his terrorist operation from Afghanistan and Pakistan to

Sudan.  According to the testimony of terrorism expert Dr. Matthew Levitt in a separate

proceeding, the Iranian government played a "very active" role in Sudan when bin Laden

operated from Khartoum.  *See Owens*, 826 F. Supp. 2d at 136 (D.D.C. 2011).  In 1991 or 1992,

statements/president-donald-j-trump-holding-iranian-regime-accountable-global-campaign-
terrorism/, accessed February 27, 2023.

al Qaeda and Iranian operatives met in Sudan and "reached an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States." Court Findings, ECF No. 294 at 16 ¶ 77 (citing 9/11 Final Report at 61). After these meetings, senior al Qaeda operatives traveled to Iran to receive explosives training. *Id.* at ¶ 78 (citing 9/11 Final Report at 61). In 1993, bin Laden and Ayman al Zawahiri met in Sudan to develop an "alliance of joint cooperation and support on terrorism" with Iran's master terrorist, Imad Mughniyah, and Iranian officials. Court Findings, ECF No. 294 at 16-17 ¶¶ 79-80.

> The 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran, Hezbollah and al Qaeda. Osama bin Laden sent more terrorist operatives, including Saef al Adel (who would become number 3 in al Qaeda and its top 'military' commander), to Hezbollah training camps operated by Mughniyah and the IRGC [defendant, Islamic Revolutionary Guard Corps] in Lebanon and Iran. Among other tactics, Hezbollah taught bin Laden's al Qaeda operatives how to bomb large buildings, and Hezbollah also gave the al Qaeda operatives training in intelligence and security.

*Id.* at 17 ¶ 83. The al Qaeda-Iran-Hezbollah terrorist training continued throughout the 1990s. "At all times, Iran's Supreme Leader [Ayatollah Ali Hoseini Khamenei] was fully aware that Hezbollah was training such foreign terrorists." *Id.* at 18 ¶ 88.

In the years that followed, this terrorist alliance orchestrated and claimed responsibility for various terrorist attacks against the United States and its allies. *See, e.g.*, *Id.* at 18-22 ¶¶ 90-115. Consistent with the evidence also endorsed by this Court, the United States District Court for the District of Columbia held that Iran was factually and legally responsible for the June 25, 1996 bombing of the Khobar Towers housing complex in Dhahran, Saudi Arabia. *See Heiser*, 466 F. Supp. 2d at 229. al Qaeda was involved in the planning of and preparation for the bombing. *See* Court Findings, ECF No. 294 at 20 ¶ 104. Shortly thereafter, in August 1996, an Iranian intelligence operative involved in the Khobar Towers attack met with bin Laden in

Jalalabad, Afghanistan to continue developing their joint terrorism campaign against the United States.  *Id.* at 20-21 ¶ 106.

> At this time, Iranian and Hezbollah trainers traveled between Iran and Afghanistan, transferring to al Qaeda operatives such material as blueprints and drawings of bombs, manuals for wireless equipment, and instruction booklets for avoiding detection by unmanned aircraft.

*Id.* at 21 ¶ 107 (citing Ex. 7, Bergman Aff. ¶ 68).

The United States District Court for the District of Columbia also recognized Iran's involvement in and responsibility for al Qaeda's August 7, 1998 bombings of the United States embassies in Kenya and Tanzania.  *See Owens*, 826 F. Supp. 2d at 135.  That court relied on testimony of Dr. Matthew Levitt to support its conclusion regarding Iran's direct assistance to al Qaeda operatives and its provision of explosives training to Bin Laden and al Qaeda, recognizing that the "government of Iran was aware of and authorized this training and assistance."  *Id.* at 139.  The *Owens* Court further found that "Iran regarded al Qaeda as a useful tool to destabilize U.S. interests. . . . [T]he government of Iran aided, abetted and conspired with Hezbollah, Osama Bin Laden, and al Qaeda to launch large-scale bombing attacks against the United States by utilizing the sophisticated delivery mechanism of powerful suicide truck bombs." *Id.* at 135. Moreover, the court in *Owens* recognized that "Hezbollah's assistance to al Qaeda would not have been possible without the authorization of the Iranian government."  *Id.* at 138.

This Court's findings of fact further recognize that, in or around October 2000, a United States Defense Intelligence Agency analyst was in the process of identifying connections among al Qaeda, Iranian intelligence agencies controlled by Iran's Supreme Leader, Hezbollah, and other terrorist groups.  Court Findings, ECF No. 294 at 22 ¶ 114.  On October 12, 2000, al Qaeda suicide bombers attacked the *U.S.S. Cole* in Yemen.  According to the 9/11 Final Report, "Iran

35

made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on

the *USS Cole*." *Id.* at ¶ 115 (citing 9/11 Final Report at 240).

### iii. Iran's Support for the September 11, 2001 Attacks

In the *Havlish* proceeding, this Court held that "Iran furnished material and direct support

for the 9/11 terrorists' specific terrorist travel operation" and the facilitation of al Qaeda's

operatives' travel to training camps in Afghanistan was "essential for the success of the 9/11

operation."  Court Findings, ECF No. 294 at 22 ¶¶ 116, 118-119.  This finding is consistent with

the statement in the 9/11 Final Report that "[f]or terrorists, success is often dependent on

travel . . . . For terrorists, travel documents are as important as weapons." *Id.* at ¶ 117 (citing

9/11 Final Report at 384).

This Court's findings of fact confirm two separate, but related, ways in which Iran

directly facilitated and supported al Qaeda relative to the September 11, 2001 attacks:

> The first way in which the Iranian government materially and
> directly supported the 9/11 terrorist travel operation was by
> ordering its border inspectors not to place telltale stamps in the
> passports of these future hijackers traveling to and from
> Afghanistan via Iran.  Several of the 9/11 hijackers transited Iran
> on their way to or from Afghanistan, taking advantage of the
> Iranian practice of not stamping Saudi passports.  Thus, Iran
> facilitated the transit of al Qaeda members into and out of
> Afghanistan before 9/11.  Some of these were future 9/11
> hijackers.
>
> * * *
>
> Iran's willingness to permit the undocumented admission and
> passage of al Qaeda operatives and 9/11 hijackers provided key
> material support to al Qaeda.  By not stamping the hijackers'
> passports, by providing safe passage through Iran and into
> Afghanistan, and by permitting Hezbollah to receive the traveling
> group . . . Iran, in essence, acted as a state sponsor of terrorist
> travel.

*Id.* at 22, 24 ¶¶ 122, 132. This Court's findings on this point are corroborated by National

Security Administration intercepts made available to the 9/11 Commission shortly before the

publication of the 9/11 Final Report. *See Id.* at 123. Moreover, "[n]umerous admissions from

lower level al Qaeda members who were interrogated at the detention facility at Guantanamo

Bay confirm the existence of the clandestine Iran-Afghanistan passageway." *Id.* at 23 ¶ 128

(citing Ex. 2, Timmerman 2nd Aff. ¶¶ 115-19).

> The second way in which Iran furnished material and direct
> support for the 9/11 attacks was that a terrorist agent of Iran and
> Hezbollah helped coordinate travel by future Saudi hijackers. As
> found by the 9/11 Commission, "[i]n October 2000, a senior
> operative of Hezbollah [Imad Mughniyah] visited Saudi Arabia to
> coordinate activities there. He also planned to assist individuals in
> Saudi Arabia in traveling to Iran during November . . . ."
>
> * * *
>
> The "activities" that Mughniyah went to Saudi Arabia to
> "coordinate" revolved around the hijackers' travel, their obtaining
> new Saudi passports, and/or U.S. visas for the 9/11 operation, the
> hijackers' security, and the operation's security.

Court Findings, ECF No. 294 at 24-25 ¶¶ 134, 140. This Court found that those activities also

"constituted direct and material support for the 9/11 conspiracy." *Id.* at 25 ¶ 144.

Additionally, Iran's provision of material support to al Qaeda continued after the

September 11, 2001 attacks, "most significantly by providing safe haven to al Qaeda leaders and

operatives, keeping them safe from retaliation from U.S. forces, which invaded Afghanistan."

*Id.* at 33 ¶ 198. Indeed, the Department of State's *Patterns of Global Terrorism* report for

calendar year 2002, released in April 2003 by the Secretary of State and Coordinator for

Counterterrorism, recognized that "al-Qaida members have found virtual safehaven there [in Iran] and may even be receiving protection from elements of the Iranian Government."[19]

In sum, it is by now well established that Iran provided al Qaeda with critical training and support, from the earliest stages of al Qaeda's formation through September 11, 2001, and even thereafter. Iran's assistance provided al Qaeda with the expertise and resources necessary to carry out large scale international terrorist attacks, and directly enabled al Qaeda to plan and carry out the September 11th Attacks. As this Court already has held, Iran's provision of material support and resources was instrumental in ultimately causing the deaths and injuries of the thousands who suffered from the September 11th Attacks, and subjects Iran to liability for those injuries.

### d. Plaintiffs Have Established Material Support and Causation

#### i. Plaintiffs Have Established Material Support

The basis of Iran's liability is its provision of material support and resources to al Qaeda, as set forth above, which caused the September 11 Attacks and resulted in the death and injuries of thousands of United States citizens. *See, e.g.*, *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 59 (D.D.C. 2009) (explaining Iran's material support to Hamas in the form of funding, safe haven, training, and weapons was responsible for suicide attacks). In order to demonstrate that Plaintiffs have a cause of action under Section 1605A, Plaintiffs must satisfy the elements of Section 1605A(a)(1). *See Owens*, 826 F. Supp. 2d at 153.

In FSIA cases involving terrorist attacks caused by a foreign state's provision of material support or resources, a court must "determine whether a defendant country has provided material

---

[19] *See* United States Department of State, *Patterns of Global Terrorism 2002*, 77, https://2009-2017.state.gov/documents/organization/20117.pdf, accessed on 08/19/2022.

support to terrorism . . . consider[ing] first, whether a particular terrorist group committed the

terrorist act[20] and second, whether the defendant foreign state generally provided material

support or resources to the terrorist organization which contributed to its ability to carry out the

terrorist act." *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008).

Section 1605A(h) adopts the definition of "material support or resources" set forth in 18

U.S.C. § 2339A:

> [T]he term "material support or resources" means any property,
> tangible or intangible, or service, including currency or monetary
> instruments or financial securities, financial services, lodging,
> training, expert advice or assistance, safehouses, false
> documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel (1 or
> more individuals who may be or include oneself), and
> transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1).

The record evidence concerning Iran's support of al Qaeda easily satisfies this definition

of "material support."  Indeed, this Court already has entered a specific conclusion of law

recognizing that Iran "provided material support and resources to al Qaeda for acts of terrorism"

including the September 11, 2001 attacks.  Court Findings, ECF No. 294 at 50 ¶ 17; *see also id.*

at 47 ¶ 7 ("'plaintiffs have established that their injuries were caused by defendants' acts of

'extrajudicial killing' and/or the provision of 'material support for such acts'").  This conclusion

clearly is correct, as the definition of material support prohibits the provision of any form of

property or service to a terrorist organization, making specific reference to "expert advice or

assistance" and "transportation" and "financial" services, all of which are forms of support Iran

provided to al Qaeda.  And the definition plainly recognizes the critical benefits terrorists obtain

---

[20] al Qaeda's responsibility for committing the September 11th Attacks is undisputed and a matter
plainly subject to judicial notice.

through any support that assists them in traveling, by expressly including "safehouse,"

"lodging," "false documentation or identification" and "transportation" as forms of prohibited

support. 18 U.S.C. § 2339A(b)(1); *see also Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d

40, 55 (D.D.C. 2006) (recognizing provision of training and travel documents to facilitate acts

constitutes material support); *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 549-54 (E.D. Va.

2007) (safe haven); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 18 (D.D.C. 1998)

(superseded by enactment of Section 1605A) ("routine provision of financial assistance to a

terrorist group in support of its terrorist activities constitutes 'providing material support or

resources' for a terrorist act within the meaning of the [terrorism exception of the FSIA]").

ii.  Plaintiffs Have Proved Causation

The applicable standard of causation is liberally construed in Section 1605A material-

support cases—namely, in such cases, Plaintiffs do not need to demonstrate any direct nexus

between the material support and the eventual terrorist act.[21] It has been established that a

"plaintiff need not establish that the material support or resources provided by a foreign state for

a terrorist act contributed directly to the act for which his claim arises in order to satisfy" the

terrorism exception of the FSIA. *Flatow*, 999 F. Supp. at 18; *see also, e.g.*, *In re Islamic

Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 44 (holding that there is no but-for

causation requirement).

Once again, this Court already has determined that the record evidence concerning the

material support Iran provided to al Qaeda is more than sufficient to satisfy the modest causation

requirement of 1605A(c).  Indeed, this Court concluded that Iran's assistance "constituted direct

---

[21] Courts addressing liability under the FSIA generally are guided by the principles of the
Restatement (Second) of Torts. *Reed*, 845 F. Supp. 2d at 212 (granting motion for default
judgment pursuant to Section 1605A).

support and material support for al Qaeda's 9/11 attacks." Court Findings, ECF No. 294 at 24

¶ 133 (citing 9/11 Final Report); *see also Id.* at 47 ¶ 7 ("'plaintiffs have established that their

injuries were caused by defendants' acts of 'extrajudicial killing' and/or the provision of

'material support for such acts'").

> **e.   The Basis for Judgment as to Liability Has Been Established**

This Court already has analyzed the evidentiary record submitted in the *Havlish*

proceeding, and as described above, issued findings of fact and law on the basis of that evidence.

Although additional materials could be offered to augment that record, the Court's holdings in

*Havlish* render any such supplementation unnecessary.  Under the circumstances, the submission

of additional or repetitive evidence would merely impose an unnecessary burden on the

resources of the Court.  To avoid that result, the Moving Plaintiffs respectfully request that the

Court enter default judgment against Iran as to liability on the basis of the evidence the Court

previously received and analyzed, and which already forms part of the record in the related

multidistrict litigation proceeding for the September 11, 2001 terrorist attacks (03 MDL 1570).

As set forth in detail above, this Court's prior findings of fact, and the affidavits and

documentary evidence already of record, provide a detailed record of Iran's involvement with

and sponsorship of al Qaeda and the September 11, 2001 attacks, and are more than sufficient to

support entry of default judgment against Iran as to liability in this action, pursuant to the

liability standards governing their Section 1605A(c) claims.

## IV.   JUDGMENTS AS TO DAMAGES SHOULD BE ENTERED

Orders of Partial Final Judgments should be entered for damages for the Moving

Plaintiffs.

### a. Damages – Governing Law

#### i. Background

Section 1605A of the FSIA permits a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1). The statute specifies that damages are available "for personal injury or death," § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4). Courts addressing the damages available under the statute have held that, among other damages recoverable, "family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3 (quoting *Valore*, 700 F. Supp. 2d at 83) .Plaintiffs identified in Exhibits A are comprised of immediate family members of those killed on 9/11, as demonstrated by documentary evidence of their familial relationship to a 9/11 decedent, such as birth or marriage certificates, sworn affidavits, official documents or other documents signed under penalty of perjury, which attest to a familial relationship eligible for recovery, and, in the case of a subsequently deceased family member, a death certificate or sworn affidavit which reflects that the claimant did not predecease the 9/11 victim.[22] *See* Goldman Declaration at ¶¶ 4-16, 18-19.

With respect to each estate plaintiff in annexed Exhibits A and Exhibits B, the personal representative has provided the undersigned counsel with proof that he or she has been appointed by the court as the personal representative of the deceased relative, except in the estates listed in

---

[22] Such evidence is consistent with that contemplated in the Court's July 10, 2018 Order, ECF No. 4045.

the tables directly below, where a petition has been filed to appoint the personal representative, is

pending, and, upon information and belief, is unopposed.

| | |
|---|---|
| **CASE NAME:** | *Alexander Jimenez, et al. v. Islamic Republic of Iran* |
| **CASE NO:** | No. 1:18-cv-11875 (GBD) (SN) |
| **PLAINTIFF:** | Elisa P. Malani a/k/a Elisa Partosoedarso Malani as the Personal Representative of the Estate of Michael Lomax, deceased, and on behalf of all survivors and all legally entitled beneficiaries and family members of Michael Lomax |

| | |
|---|---|
| **CASE NAME:** | *Susan M. King, et al. v. Islamic Republic of Iran* |
| **CASE NO:** | No. 1:22-cv-05193 (GBD) (SN) |
| **PLAINTIFFS:** | Michael R. Kuo as the Personal Representative of the Estate of Frederick Kuo, Jr., deceased, and on behalf of all survivors and all legally entitled beneficiaries and family members of Frederick Kuo, Jr. |
| | Jamie Brito as the Personal Representative of the Estate of Victoria Alvarez-Brito, deceased, and on behalf of all survivors and all legally entitled beneficiaries and family members of Victoria Alvarez-Brito |
| | Jamie Brito as Personal Representative of the Estate of Mario Brito, deceased, the late spouse of Victoria Alvarez-Brito |

As liability has been established in this matter, as provided for above, each Moving

Plaintiff is now entitled to damages in the amounts set forth in Exhibits A, which reflect the

damage amounts previously established and applied by this Court in this and other related cases

arising from the September 11th Attacks or based upon expert economic reports submitted

herewith.  In accordance with the terms of the FSIA, the Moving Plaintiffs are entitled to

compensation under Section 1605A for their solatium, pain and suffering and economic

damages, as applicable, and are also entitled to prejudgment interest.

43

### b. Solatium Damages

As set forth above, the FSIA specifically provides for an award of solatium damages. Under § 1605A, family members of a decedent may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of a decedent's society and comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003), vacated on other grounds, 404 F. Supp. 2d 261 (D.D.C. 2005). Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). In cases brought under this exception to the FSIA, solatium claims have been treated as analogous to claims for the intentional infliction of emotional distress. *See, e.g.*, *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "indistinguishable from the claim of intentional infliction of emotional distress" (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001))).

When previously awarding solatium damages in other cases related to the September 11th Attacks, such as those noted above, this Court looked at the framework established by District Court Judge Royce C. Lamberth in *Heiser*, 466 F. Supp. 2d at 229, where the court awarded solatium damages to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million. *Id.* This formula, however, may be adjusted upward or downward when circumstances warrant. *See, e.g.*, *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Analyzing the solatium claims of the families of the *Havlish* victims who perished in the September 11th Attacks, Magistrate Judge Maas concluded that an upward departure from Judge Lamberth's framework in *Heiser* was appropriate because the decedents' immediate family members suffered, and continue to suffer "profound agony and grief" and "[w]orse yet, . . . are faced with frequent reminders of the events of that day."  ECF No. 2618 at 10-12.  Judge Maas noted in his July 30, 2012 Report and Recommendation the "extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families . . ."  *Id.* at 11.  In that Report and Recommendation, with which this Court later agreed, Magistrate Judge Maas recommended that solatium damages be awarded to the immediate family members of the victims of the September 11th Attacks in the following amounts:

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 11.

These exact amounts were adopted by this Court in its October 3, 2012 Order, ECF No. 2623, and were replicated in this Court's June 16, 2016 Order relating to the claims of certain of the *Ashton* Plaintiffs, ECF No. 3300, in the September 12, 2016 Order pertaining to plaintiffs in the *Bauer* case, ECF No. 3341, in the October 14, 2016 Report and Recommendation, ECF No. 3363, and in the October 31, 2016 Order in the *Hoglan* case, ECF No. 3384.  These amounts were, again, adopted by this Court in its April 24, 2018 Order relating to the claims of additional *Ashton* Plaintiffs, ECF No. 3977 at 6–7.  The same amounts were recently adopted in the Court's

June 8, 2018 (Corrected) Order of Partial Final Default Judgment in the matter known as *Burnett/Iran II*,[23] No. 15-cv-09903, ECF No. 101.

The solatium losses suffered by the Exhibits A Plaintiffs before the Court in this application are legally and factually comparable to those suffered by the plaintiffs in the *Havlish*, *Ashton*, *Bauer*, *Hoglan, O'Neill* and *Burnett* cases. As such, Plaintiffs identified in Exhibit A respectfully request that the Court grant awards of solatium to the immediate family members as identified in Exhibits A in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton*, *Bauer*, *Hoglan, O'Neill*, and *Burnett* cases.

i.  <u>Individuals Not Named in the Complaint (Notices of Amendment)
    Entitled to Solatium Damages</u>

Pursuant to paragraph 5 of Section II(D) of the Plaintiffs' Executive Committee's January 23, 2017 letter, ECF No. 3433, which was adopted by the Court through its January 25, 2017 Order, ECF No. 3435, individuals who are not named in the complaint, but are otherwise a member of the 9/11 decedent's family, are entitled to receive a judgment for solatium based upon their relationship to the 9/11 decedent and where there is a pending claim by the personal representative of that decedent's estate. The letter provides "[i]n instances where a default judgment is sought by a personal representative in favor of a solatium claimant who is not a named plaintiff in the action in which the award is sought, counsel requesting the judgment will be asked to confirm that: (1) the personal representative has requested that a judgment be sought in favor of the solatium claimant; (2) the solatium claimant has been contacted and affirmed that he or she authorized the personal representative to seek the judgment in his or her favor; and (3)

---

[23] The same values were applied to the claims of other plaintiffs in the earlier *Burnett* case in this Court's order of July 31, 2017. ECF No. 3666.

counsel has confirmed that the solatium claimant in favor of whom the judgment is being sought has not retained other counsel or been named in any other action or, if he or she has, that counsel has communicated with the claimant's counsel and received authorization to seek the judgment via the estate's representative."  ECF No. 3433 at 7; *see also* ECF No. 5234.

Such individuals are indemnified and the compliance with such procedure is described in ¶¶ 15-16 and Exhibits F to the Goldman Declaration.

Accordingly, judgment should be entered in such Plaintiff's favor as if they were named plaintiffs, in the same amounts indicated herein, consistent with this Court's application of those values established and applied in prior proceedings in this *MDL*.

### c.   Pain and Suffering Damages For Estates

As noted above, the plaintiffs identified in annexed Exhibits B include the personal representatives of the estates of individuals who were killed in the 9/11 Attacks, some[24] of which seek compensatory damages for the decedent's pain and suffering. This Court previously assessed the entitlement and value of pain and suffering awards to estates for their decedents' deaths in this litigation. ECF No. 2618 at 7-9.

For the reasons articulated by this Court previously, the above stated Estates as set forth in annexed Exhibits B respectfully request that the Court grant awards for the decedent's pain and suffering in the amount of Two Million Dollars ($2,000,000) per estate. *See Id.* at 9; ECF No. 2624 at 1, 3-4 (Judge Daniels awarding $2,000,000 per estate).  *See* Goldman Declaration at ¶ 20.

---

[24] Some estates in Exhibits B only seek pain and suffering damages, some estates only seek economic damages (as they were previously awarded only pain and suffering damages), and other estates seek both pain and suffering damages and economic damages.

### d. Personal Injury Damages - Pain and Suffering

This Court has carefully crafted a framework for personal injury damages awards for pain and suffering for plaintiffs who sustained injuries during the September 11, 2001 terrorist attacks. *See* Magistrate Judge Netburn's February 7, 2020 Report and Recommendation, ECF No. 5879, adopted by Judge Daniels' Memorandum Decision and Order, ECF 5946. The chief factors to be considered include "the severity of the pain immediately following the injury, the length of hospitalization and the extent of impairment that will remain with the victim for the rest of his or her life." ECF 5879, at 3, *quoting O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 46 (D.D.C. 2012).

In briefest form, the Court has defined and categorized what kind of injuries will typically be considered to be: a)" significant"; b) "severe"; or c) "devastating," as follows:

1. "Significant" injuries include: "single broken bones; cuts/lacerations/bruises; mental health disorders; concussions; being covered in dust or debris; significant respiratory ailments including nasal irritations, chest pain, and asthmas from inhalation of smoke, soot and dust; cuts/bleeds; and significant orthopedic injuries such as strains, sprains, or fractures that cause continuing intermittent pain and may require surgery. This category will also include short term or relatively minor non-debilitating physical injuries, or even the absence of serious physical injuries combined with severe emotional injuries." ECF 5879 at 6-7.

2. "Severe" injuries include: "multiple broken bones; burns; significant injuries from falling, being buried, or being trampled; severe orthopedic trauma requiring significant or multiple surgeries and/or causing severe constant pain or debilitation; muscular trauma; mental health trauma and disorders; severe head injuries causing frequent headaches, migraines, or some lasting cognitive impairment; and severe pulmonary or neurological traumas." *Id.* at 7.

3. "Devastating" injuries include: "loss of limbs or multiple digits; severe pulmonary traumas; strokes, paraplegia; traumatic brain injuries causing muscle weakness, atrophy, or severe cognitive impairment; significant disfigurement; severe burns covering significant body area; pulmonary traumatic exposures; and acute systemic trauma. Injuries causing lasting physical effects severely limiting victims' mobility and activity will generally qualify for this category." *Id.* at 8.

48

This Court then established "a baseline award of $7 million, an upward deviation of $10 million, and a downward deviation of $5 million for personal-injury damages for pain and suffering arising from injuries sustained on September 11, 2001. The Court, however, reserved its discretion to award further upward departures in exceptional cases." *See* ECF No. 5879 at 6; ECF No. 5955 at 3.

The Court has also reserved discretion to award further upward departures in exceptional circumstances – as where, for example, plaintiffs Grace and Edwin Rivera, a wife and husband who were *together* on September 11, were awarded *twelve* million dollars in damages each in light of the fact that they were each devastatingly injured and each "suffered through the experience together." *See* Memorandum Decision and Order, February 14, 2020, ECF No. 5955, 1-3. *See also* ECF No. 5955, at 3-4 (awarding *twenty-five* million dollars in damages for injuries that were "beyond devastating" in the case of Lauren Manning, who was burned over eighty-five percent of her body and who requires around-the-clock care to this day. ECF No. 5909, 11-13.)

### i. P.A.P.D. Officer William "Will" Jimeno

When terrorists struck the World Trade Center with jet planes, new Port Authority Police Department ("PAPD") Officer (and new father) Will Jimeno volunteered to help save people from the burning Towers.[25]  But the South Tower suddenly collapsed on Will Jimeno and his team of PAPD Officers, and Will was trapped – buried alive in a dark pit full of rubble.  Will was pinned down by a huge slab of concrete that was slowly but surely crushing the life out of his body, and that caused him continuous, almost unbearable, pain.  A short time later, Will's

---

[25] *See* the accompanying Declaration of William Jimeno dated July 29, 2022.  References to "Jimeno Dec." are to Officer Jimeno's July 29, 2022 Declaration, References to "*Sunrise*" are to Officer Jimeno's book *Sunrise Through Darkness:  A Survivor's Account of Learning How to Live Beyond 9/11.*  (Colorado Springs, Co., University Professors Press, 2021.)

good friend and fellow Officer Dominick Pezzulo was killed at Will's side when the North Tower also collapsed on Will's team. For the next thirteen hours Will remained immobilized beneath the wreckage of the two Towers – surrounded by fire, smoke and explosions, crushed by a huge slab of concrete, afraid that he would never be found, and in terrible pain all the while.

Ultimately, former Marines who were searching for survivors found Will, and he was saved after a grueling three hour rescue operation. (Officer Jimeo was the third to last person to be rescued alive from the World Trade Center site.) But Will had suffered massive crush injuries. He was rushed to the hospital. There he "flatlined" twice, but survived. He was hospitalized for three months, and endured eight separate surgeries (and multiple skin grafts) on his legs. Upon his release from the hospital, Will had to go through nearly another year of full-time rehabilitation on an outpatient basis. It took that long for Will to learn to walk (after a fashion) again.

Will's left leg suffered permanent muscle loss and nerve damage, and it is badly deformed. He will have to wear a brace for the rest of his life. He can neither walk nor stand for an extended period of time. Prior to 9/11, Will was something of an athlete who enjoyed soccer and the martial arts. But now Will must use a motorized scooter just to get around, because his left leg still collapses on him from time to time. He cannot feel anything on certain parts of his left leg; yet other parts of his leg are still so sensitive that a mere touch can cause him to pass out from the resulting pain. He cannot work, and he struggles with PTSD to this day.

For the reasons detailed below, plaintiff Jimeno submits that his injuries should be placed in the category of "beyond devastating," and that he should be awarded damages for his extraordinary (indeed, almost unique) pain and suffering in the amount of twenty-five million dollars.

### - Jimeno's Life Before 9/11 -

William ("Will") Jimeno was born in 1967 in Barranquilla, Colombia.  When he was a small boy his family came to the United States seeking a better life.  They settled in Hackensack, New Jersey.  Will was raised in Hackensack, and attended school there from kindergarten through high school.  His father was a welder, and his mother was a beautician.  Will's parents made a point of telling Will that America was the greatest county in the world, and they stressed the importance of patriotism.[26]

Will grew up wanting to make a difference and to contribute to the country that had given his family so much.  So, after he finished high school, Will enlisted in the U.S. Navy, and served on the U.S.S. *Tripoli* as a gunner's mate from 1986 to 1990.[27]

After completing his military service, Will moved back to Hackensack and enrolled at Bergen Community College.  He studied criminal justice and took various law enforcement civil service tests.  Will's dream was to become a police officer in order to protect and serve his community.  He also worked part-time as a store security officer while in school.[28]

In August of the year 2000, Will Jimeno was accepted into the Port Authority Police Department ("PAPD") Academy.  He successfully completed the Academy and graduated in the 100th PAPD class.  The graduation ceremony was conducted on January 19, 2001 at the Marriott World Trade Center.  In his spare time, Will liked to play soccer and participated in the martial arts too.  He also liked to hunt with a bow and arrow, and he enjoyed athletic activities in general.[29]

---

[26] Jimeno Dec. ¶ 1.

[27] Jimeno Dec. ¶ 2.

[28] Jimeno Dec. ¶ 3.

[29] Jimeno Dec. ¶ 4.

51

In 1992, Will met his future wife, Allison, at Steinbach's Department Store (where Will was working as a Security Guard.)  Will and Allison were married in 1995, and their first daughter Bianca was born in 1997.  They bought a new home in Clifton, New Jersey in the summer of 2001.  Allison was expecting their second daughter that fall.[30]

In short, on September 10, 2001, Will Jimeno was thirty-three years old and in good health, a PAPD officer doing the job that he had always wanted to do, and a happy family man.[31]

### - September 11 -

September 11, 2001 started much like any other day for Will.  He woke up very early, kissed his wife Allison (and her pregnant belly) and his daughter Bianca goodbye.  Then Will left for work.  Will was scheduled to work a day shift from 7:00 a.m. until 3:00 p.m. at the Port Authority Bus Terminal in Manhattan that day.[32]

Will was stationed at 42nd Street and 8th Avenue that morning.  While Will was out on patrol, his Sergeant (Sergeant Ross) pointed into the air and followed an object with his finger. Will looked up and saw a very large shadow that covered up the intersection below.  (Only later did Will realize that this had been the shadow of American Airlines Flight 11.)[33]

A few minutes later a command was given over PAPD radio ordering all PAPD Officers in the area to report back to the Port Authority Bus Terminal.  Will and his fellow Officers congregated in the reserve room to await further instructions.  Will saw Antonio Rodrigues and Dominick Pezzulo.  Antonio (or "A-Rod") and Dominick (or "Dom") were Will's friends and fellow PAPD officers with whom he had graduated in the 100th class.  The television news was

---

[30] Jimeno Dec. ¶ 5.

[31] Jimeno Dec. ¶ 6.

[32] Jimeno Dec. ¶ 7.

[33] Jimeno Dec. ¶ 8.

on and it showed the North Tower of the World Trade Center on fire.  There was a gaping black hole in the Tower and thick smoke coming from the building.  Sergeant Ross told the assembled Officers that terrorists had attacked the United States.  Will immediately called his wife to let her know that he was okay; he did not want her to worry.  Inspector Fields informed Will and his fellow Officers that the PAPD had commandeered a bus on 9th Avenue to transport Officers to the World Trade Center.  Will Jimeno was called to assist at the scene, along with Sergeant John McLoughlin, Antonio, Dominick, and many others.[34]

Will's bus unloaded on West Broadway in downtown Manhattan sometime after the South Tower was hit.  The scene looked like a war zone.  Debris from the World Trade Center reached for several blocks from the Towers.  People were running away from the World Trade Center as fast as they could, with a look of terror on their faces that Will had never seen before.  Will saw people jump from the burning buildings to their death, and he saw severed body parts on the ground.  Even worse – if that is possible – Will saw several people on the ground killed when struck by people jumping from the Towers.[35]

Sergeant McLoughlin asked for volunteers who knew how to use Scott Air Packs.  (The Scott Air Pack is a breathing apparatus used by PAPD Officers when fighting fires.)  Dominick, Antonio, and Will answered the Sergeant's call and volunteered to help.  Together they ran up Vesey Street to the side of Building 5.  Sergeant McLoughlin, Dominick, Antonio, and Will entered the Main Concourse area of the World Trade Center.  Civilians were evacuating the building single file.  Will looked out into the center of the World Trade Center complex, and he

---

[34] Jimeno Dec. ¶ 9.

[35] Jimeno Dec. ¶ 9, *Sunrise*, pp. 10-11, 15.

heard and saw more people leaping to their certain deaths from the burning Towers and then hitting the ground below.[36]

Sergeant McLoughlin, Dominick, Antonio, and Will hurried towards the South Tower. They ran into fellow PAPD officer Christopher Amoroso there, and he asked to join the group. When Will looked into the lobby of the South Tower, he saw more dead bodies and injured people. He also heard gunshots and saw police officers shooting out the windows so that more people could escape the buildings. Will Jimeno was terrified. He was also determined to stay close to Sergeant McLoughlin because Will (and the others) respected McLoughlin's experience and leadership and believed that McLoughlin knew best how to deal with the chaos unfolding all around and stay safe.[37]

As Will's small team of PAPD Officers were standing in the Concourse between the North Tower and the South Tower, Will heard a loud "boom" and he saw a fireball about the size of his own house enter the lobby of the South Tower. Will was thrown on to his back, and then it seemed to him that everything just went black. He frantically yelled "8-13" (police code for "Officer down") into his radio, but something knocked the radio out of his hand. Concrete and other debris were raining down all around Will. An object knocked his helmet off his head. The South Tower had collapsed at 9:59 a.m., and (although Will did not fully understand what was happening at the time) the remains of the Tower were now falling down on top of Will and his colleagues.[38] (Attached as Exhibit A to the accompanying Declaration of William Jimeno is a map of the World Trade Center which notes Will's location at the time of the collapse.)

---

[36] Jimeno Dec. ¶ 10.

[37] Jimeno Dec. ¶ 11; *Sunrise*, p. 13.

[38] Jimeno Dec. ¶ 12.

Will found himself buried deep underground below a huge mound of debris created by the collapse of the South Tower, lying down on his back.  Will's Scott Air Pack was beneath him, and it propped Will up to an approximately forty-five-degree angle.  A large piece of concrete had fallen across Will's chest and down his left side, pinning him down.  The concrete was crushing Will.  He tried to move his body, but all he could do was move his right arm and (to a limited extent) his left arm.  Will tried to lift the concrete off his body and escape, but he was trapped.  No matter how hard he tried, he could not get the concrete to budge.  When Will looked up, he saw a hole with light coming through it approximately thirty feet above him.  He thought he was going to die.[39]

Will looked to his left and saw Dominick not more than a foot away.  Dominick was in a pushup position, buried face down on his chest.  Sergeant McLoughlin was buried in a fetal position near Will's feet, but out of sight because there was so much rubble between the two men.[40]

Sergeant McLoughlin shouted, "Sound off!" to see who had survived.  Will responded, "Jimeno." Dominick responded, "Pezzulo."  And then Will heard silence.  Antonio and Chris did not answer.  (They had been killed by the same shower of concrete and debris from the collapse of the South Tower that had trapped the Sergeant, Dominick and Will.)  Will realized that Chris and Antonio were probably dead.  Dominick (who had previously been a New York City public school teacher) said they were in a better place, and that they were great fathers, friends, and Americans.[41]

---

[39] Jimeno Dec. ¶ 14.

[40] Jimeno Dec. ¶ 15.

[41] Jimeno Dec. ¶ 15; *Sunrise*, p. 5.

Dominick told Sergeant McLoughlin that Dominick thought he could maneuver out of his position.  Eventually, Dominick did manage to free himself.  At that point, Dominick said that he could leave and go get help.  But Sergeant McLoughlin ordered Dominick to stay and to try to rescue Will instead.  Dominick crawled over Will's face into a small area on Will's right side to try to free Will from the concrete.  Will had been in a state of physical shock.  But now that shock was wearing off, and he began to experience excruciating pain on the left side of his body.  His left side was being crushed by what felt to Will like the weight of three hundred SUV's.  Dominick tried to get the concrete off Will for about fifteen minutes, but Dominick was unable to do so.  And each time Dominick tried to move the concrete it fell back against Will and caused him even greater pain; Will kidded his friend (using rough language) Dominick that Dominick was beating him up.  Finally, Dominick told Will that he could not get Will out.[42]

A moment later, Will heard another loud explosion, and concrete and debris started raining down on the three men all over again.  This was the collapse of the North Tower at 10:28 a.m.  Will felt himself getting crushed.  He looked to his right, and he saw Dominick get hit in the middle of his body and knocked down by a large slab of concrete.[43]

Will thought he was going to die within the next few seconds.  So he made the "I love you" sign language sign.  He had often made that sign with his wife and daughter.  Will thought was that if he were found dead with this sign across his chest, then his wife and daughter would know that he had thought of them in his last moments.[44]

---

[42] Jimeno Dec. ¶ 16; *Sunrise*, pp. 20-21.

[43] Jimeno Dec. ¶ 17.

[44] Jimeno Dec. ¶ 18.

After the noise stopped, Will looked to his right.  He saw Dominick bleeding profusely, with blood pouring out of Dominick's mouth.  Dominick exclaimed that he was dying. (Dominick addressed Will by his childhood nickname "Willy" because the two friends were so close; very few people outside of Will's family knew or used this nickname.)  Will urged his friend Dominick to try and hold on.  Dominick turned to Will and asked that Will never let anyone forget that Dominick was killed while trying to save Will.  Will promised Dominick that Will would never let anyone forget that.  Dominick grabbed his firearm and fired one round into the air in a last-ditch effort to call for help.  Then Will's friend Dominick died – killed while trying to save Will.  Will told Sergeant McLoughlin that Dominick was dead.  Sergeant Mcloughlin told Will to compose himself and to keep trying to get free.[45]

Will kept yelling out, "PAPD Officers down!" so as to let anyone who might be up above know that he and Sergeant McLoughlin were still there - alive and buried deep underneath the rubble.  At some point, a man somewhere above them shouted in their direction, and the man asked for someone by name.  Will responded, saying said that the person the man had named was not there; but Will pleaded with the man to help rescue Will and McLoughlin, because they were badly hurt and three members of their group had already died.  Apparently, the man moved on; Will did not hear his voice again.  Will felt abandoned, and for a time he gave up hope that he and McLoughlin would ever be found and saved.  Sergeant McLoughlin calmed Will down, and suggested that the man they had heard might be hurt or in shock himself.[46]

---

[45] Jimeno Dec. ¶ 19; *Sunrise*, p. 6.

[46] Jimeno Dec. ¶ 20.

At some point, fireballs started falling into the hole where the Sergeant and Will were buried and trapped. Will felt his arm burning. As a former Navy man, he knew that he smelled jet fuel, and he feared that he would burn to death if his uniform caught fire.[47]

Then Will saw sparks above him and he heard a loud bang. He looked over and saw Dominick's weapon was now discharging on its own because of the intense heat. The gun was pointed in Will's direction. Will covered his face and heard the gun fire off fifteen rounds. It seemed like a miracle to Will that he did not get hit by any of the bullets.[48]

Later that awful day, Will heard what sounded like yet another large explosion in the distance. This was the collapse of Building 7 at 5:21 p.m.[49]

Time crawled by. Sergeant McLoughlin and Will tried to keep each other awake by talking with each other. McLoughlin (a former paramedic) correctly opined said that the two men were suffering from compartment syndrome and that they would die if they were not rescued by morning. (Compartment syndrome is usually caused by crush injuries. Pressure builds up within the body which causes great pain and can ultimately kill a person.) Will was in terrible pain, and thought he would die. He thanked God for his years with his wife, daughter, and parents. Will pleaded with God to let him see his second baby be born; and Will asked God for a glass of water because he was dying of thirst.[50]

Will saw a vision of Jesus, and then he suddenly woke up, determined once again to fight for his life. He vowed that he would not let the terrorists win. He did not want to give up on his

---

[47] Jimeno Dec. ¶ 21.

[48] Jimeno Dec. ¶ 21.

[49] Jimeno Dec. ¶ 22.

[50] Jimeno Dec. ¶ 22; *Sunrise*, p. 24.

Sergeant, his family, his country, or himself.  Will made a private vow that, if he had to die, then it would at least be on his own terms.  He would die while fighting to survive.[51]

Will noticed a piece of pipe a foot or two above him that appeared to contain a few drops of water.  He reached for the pipe, but that process took nearly twenty minutes because Will's arm and hand had become so badly swollen.  The pipe did not contain water, but it did make a loud banging sound when Will pulled on it.  Sergeant McLoughlin heard the sound and urged Will to keep pulling on the pipe in the hope that the noise might draw someone's notice.  Will did so, but it took him about twenty minutes to reach the pipe each time he tried.[52]

At about eight in the evening of September 11, 2001 – that is about ten hours after Will was first pinned helpless underground by a huge slab of concrete that was slowly crushing him – Will heard someone shout, "U.S. Marine Corps," and ask for anyone who heard to yell back.  Will shouted back that PAPD Officers were down.  Will was hearing the voices of two former Marines, Jason Thomas and David Karnes, and of a civilian.  They were at the scene searching for survivors to rescue.  They pointed a flashlight down into the hole and in Will's direction for several minutes.  But Will was surrounded by so much concrete and dust that they could not see him.  Finally, Will mustered enough saliva to spit on to his left hand.  This caused his hand to shine a little in the flashlight's glare, and the rescue workers finally spotted Will.[53]

A short time later rescue workers from New York City Emergency Services descended into the rubble.  They came in from Will's right side and dug a hole in the debris to get to him.  All this time, an encroaching fire was coming in from above.  All the men were in danger of

---

[51] Jimeno Dec. ¶ 23.

[52] Jimeno Dec. ¶ 24.

[53] Jimeno Dec. ¶ 25.

being burned to death soon.  And, each time the rescuers moved, the rubble shifted; the rescue workers were therefore deeply concerned that the hole could collapse and that they too could be buried and killed.[54]

Sergeant McLoughlin did not speak as the rescuers tried to dig Will out.  Will told the rescuers to get his partner out first.  But for some reason Will used the word "partner" instead of "Sergeant."  As a result, the rescue workers thought that Will was talking about Dominick, who was right next to Will and already dead.[55]

The rescue workers took turns crawling down into the rubble to try to dig Will out.  The process of digging caused the rubble to shift, which in turn caused Will even greater excruciating pain.  When his rescuers had difficulty getting Will's left leg out, Will told them to cut it off so they could save both Will and McLoughlin.  But the rescuers refused to do so.[56]

Finally, the rescuers freed Will's left ankle.  Will shouted to Sergeant McLoughlin to hold on.  McLoughlin responded by asking how everything was going.  The rescue workers then realized that McLoughlin was the "partner" to whom Will had been referring, and that McLoughlin was still alive. [57]

It took approximately three hours altogether for the rescue workers to dig Will out from under the rubble.  All the men were engulfed by heat and smoke the entire time, and Will experienced terrible pain throughout.  Most of the work had to be done by hand, and there was constant danger that the men could all be killed – either by fire, or by the pile collapsing.[58]

---

[54] Jimeno Dec. ¶ 25; *Sunrise*, pp. 41-2.

[55] Jimeno Dec. ¶ 25.

[56] Jimeno Dec. ¶ 26.

[57] Jimeno Dec. ¶ 26.

[58] *Sunrise*, pp. 24-44.

60

All in all, Will Jimeno was buried under the rubble of the World Trade Center for approximately thirteen hours.  Once Will was lifted out of the rubble, he looked up and asked where everything was.  A firefighter told Will that it was all gone.  Until then, Will did not fully understand that commercial jet planes had hit the Towers.  He had thought that perhaps a car bomb had gone off.  Now Will realized that both Towers had completely collapsed and disintegrated, and that many, many people must have been killed.  So, Will Jimeno wept.[59]

Will Jimeno was one of a team of five men from the PAPD who ran into the Concourse on the morning of September 11 to aid in evacuating the World Trade Center.  Of those five, Antonio Rodrigues and Chris Amoroso were killed when the South Tower fell on the group.  Dominick Pezzulo, Sergeant McLoughlin, and Will survived the collapse of the South Tower, but were buried alive.  Dominick managed to free himself briefly, but he was then killed when the North Tower fell on the group too.  Will was pulled out of the rubble after thirteen hours.  And, eight hours after that, on the following morning, Sergeant McLoughlin was finally pulled out too, still alive.

### - The Hospital Saves Will's Life -

Will was taken by ambulance to Bellevue Hospital.  Once he got to the emergency room, he "flatlined" twice.  The doctors brought him back to life each time.  They also cut Will open from his upper left thigh all the way down to his left ankle in order to relieve the pressure in his leg.  (Will's left leg had quadrupled in size.) He was placed under general anesthesia.  Will needed to be intubated and he could not speak for several days.  His hands were so badly swollen that he could not write or use sign-language either.[60]

---

[59] Jimeno Dec. ¶ 27.

[60] Jimeno Dec. ¶ 29.

Will had pulverized concrete and gravel in his head and neck. The doctors explained that in addition, due to the compression of the concrete, his body had in essence released toxins and poisoned itself. As a result, Will suffered severe nerve and tissue damage and his left leg contained significant quantities of dead and dying muscle tissue. Will's kidney and liver were also not functioning properly. (Attached as Exhibit B to Officer Jimeno's Declaration is a true and correct copy of Officer Jimeno's medical records.)[61]

Will had eight debridement surgeries over the next thirteen days to remove dead tissue from his leg. (Attached as Exhibit C to the Jimeno Declaration are photos of Jimeno's leg. WARNING: THESE PHOTOS ARE VERY GRAPHIC). Will had surgery every other day because the doctors wanted his leg to rest and heal between surgeries; that way, they would not remove tissue that might recover on its own.[62]

Skin grafts were performed in order to close the wounds to Will's left leg. Doctors took the skin for the grafts from Will's upper right thigh. After the skin grafts were performed, Will was brought back to the operating room and the doctors manipulated his leg because it had been immobilized for too long. This caused the most excruciating pain Will has ever known. But, then again, in Will's view every night in the hospital was a "horror show" due to the pain that he was experiencing. Morphine did not help to ease his suffering. He could not sleep because everything hurt so badly. Even simply being moved to take x-rays caused Will to cry from pain.[63]

---

[61] Jimeno Dec. ¶ 30.

[62] Jimeno Dec. ¶ 31.

[63] Jimeno Dec. ¶ 32.

62

On September 13, 2001, doctors used a suction instrument to remove gravel from Will's lungs. The doctors asked Will's wife if he was a smoker, and they were surprised when she said no. The doctors explained that (as a result of breathing the smoky and super-heated air at the World Trade Center site) Will's lungs looked as if he had smoked for thirty years. Will could not consume whole foods for several weeks, and needed to be given liquid food intravenously. Will also developed blood clots while at Bellevue Hospital. He was therefore put on blood thinners in order to prevent an embolism.[64]

### - Physical Rehabilitation -

After more than a month at Bellevue Hospital, on or around October 19, 2001, Will was transferred to Kessler Rehabilitation Institute in West Orange, New Jersey. He stayed there as an inpatient until he was discharged on the Friday before Thanksgiving of 2001. Will's wife Allison gave birth the Monday after that Thanksgiving to a beautiful baby girl, named Olivia. Will was (and is) grateful to God that he had somehow lived to see the birth of his second daughter.[65]

After Will returned home, he continued his treatment at Kessler Rehabilitation Institute in Saddle Brook, New Jersey on an outpatient basis. Will was transported there by ambulance daily. The PAPD assigned an Officer to stay with Will throughout his rehabilitation – five days per week, for nine more months. Will endured a long and painful recovery. Throughout his outpatient treatment, his skin grafts were still healing, and he experienced terrible pain. He had to use a wheelchair for a long time. Slowly, he worked his way up to a walker, then crutches, and then finally to a cane. Will could not walk by himself until the summer of 2002. All in all,

---

[64] Jimeno Dec. ¶ 33.

[65] Jimeno Dec. ¶ 34.

Officer Jimeno spent approximately one year in outpatient rehabilitation.  He undertook physical therapy, occupational therapy, and multiple sessions with a scar tissue specialist to break up hard parts of his skin grafts.  He learned how to live as a disabled person, including how to dress himself, shower, and enter a car.[66]

### - Jimeno's Continuing Physical Disability -

Will's injuries forced him to retire from the PAPD in 2004.  He was promoted to Detective just before his last roll call in November of 2004.  He has not been able to work since. Will still cannot walk or stand for very long, and on what seem like random occasions his left leg still sometimes just stop working altogether.  The New York Pension Board immediately approved Officer's Jimeno's request for disability pay.  But Will's family has struggled financially since September 11 due to his inability to work.[67]

Will's leg is disfigured and deformed, and he is permanently disabled as a result of the injuries he sustained on September 11th.  His left leg looks like a "great white shark took a bite out of it;" there is a hole in Will's leg that is about as big around as a quarter and around a half an inch deep.  The hole in Will's leg is still terribly sensitive on the inside.  The muscles in Will's left leg have not grown back and his leg has not recovered its strength.  It is severely atrophied and looks completely different than Will's right leg due to the extensive removal and loss of muscle and tissue.[68]

Will has extreme sensitivity on certain parts of his left leg.  As a result, he needs to be very, very cautious.  If an object brushes against Will anywhere from his left kneecap down to his calf, the pain will bring Will to his knees, and he may pass out.  For example, Will once

---

[66] Jimeno Dec. ¶ 35.

[67] Jimeno Dec. ¶¶ 36-38.

[68] Jimeno Dec. ¶ 39.

accidentally brushed this area of his left leg against a corner of his coffee table. Will was knocked unconscious by the pain.[69]

Will has extensive skin grafts and scars all over his leg. The peroneal nerve in Will's left leg, which permits the foot to point up and down, is severed. He will therefore need to wear a brace on his left leg for the rest of his life in order to keep his foot from "flopping around." Will also has permanent nerve damage, and cannot feel the front part of his left foot and leg that extends from the top of his toes to the top of his shin.[70]

Officer Jimeno has changed his entire life in order to accommodate his physical disabilities. His family was forced moved to a new house for better accessibility. Some days the pain in Will's leg is so bad that he simply cannot walk. For safety reasons, he continues to need to rent motorized seated scooters when traveling, because he cannot stand or walk for an extended period of time. He needs to be careful when walking without a brace. Will tries not to go out during snowstorms or when there is ice on the ground, because a fall for him could be catastrophic. He needs to hold on to bannisters with both hands, or else he can easily fall down stairs. It is also dangerous for Will simply to take a shower because his left foot and leg can give out at any moment.[71]

### - Psychological Effects -

Will has suffered, and continues to suffer, severe emotional distress as a result of the events of 9/11. To this day, he tries to avoid going into New York City because it makes him think of 9/11 and leaves him feeling uneasy. Will has been diagnosed with and treated for Post-Traumatic Stress Disorder ("PTSD") that came about because of what he experienced and

---

[69] Jimeno Dec. ¶ 40.

[70] Jimeno Dec. ¶ 41.

[71] Jimeno Dec. ¶ 42.

witnessed on September 11, 2001.  He has nightmares regularly, and experiences bad memories that he cannot control.  In particular, the memory of seeing his friend Dominick die haunts Will to this day.[72]

Perhaps worst of all, Will's PTSD made him develop anger issues, and his wife and children have had to suffer as a result.  Will found that he was often irrational, angry and cruel with them or around them.  He could not control his persistent mood swings.[73]

Ultimately, Will sought professional help because he did not want to be a bad father and husband.  He saw a PAPD therapist from 2002 to 2004.  He also saw a psychologist through his labor union.  Later, he began working with a private therapist, and with her help Will came to understand more fully that PTSD is a lifelong condition.  It cannot be "cured."  Will and his family will have to find ways to live with it and deal with it for the rest of his life.[74]

Will Jimeno is now fifty-four years old, and he continues to struggle with the fact that he is permanently disabled.  At times, he does not "feel like a man" because he is unable to work, and because he often needs help just to get through some of the simplest activities of daily life.  It also hurts Will to know that he cannot run around with his children, or even show them how to kick a soccer ball.  Will was once a physically active man.  He played soccer and enjoyed participating in the martial arts.  But he has had to give up all those hobbies.  In Will's view, he is still not even close to being the same person that he was before September 11.[75]

Officer Jimeno has written two books: a children's book entitled *Immigrant, American, Survivor: A Little Boy Who Grew Up To Be All Three*, and a book for adults entitled *Sunrise*

---

[72] Jimeno Dec. ¶ 43.

[73] Jimeno Dec. ¶ 44.

[74] Jimeno Dec. ¶ 45.

[75] Jimeno Dec. ¶ 46.

*Through the Darkness: A Survivor's Account of Learning How to Live Again Beyond 9/11.* (Will's *Sunrise* book gives a far more detailed narrative of the events recounted here in brief. Will's story has also been featured extensively in the media. The ordeal that Will and Sergeant McLoughlin endured is portrayed in the movie *World Trade Center*. Attached as Exhibit D to his Declaration are some articles about Will's experiences.) Will sometimes give talks to various groups about his experiences on 9/11. He hopes that his books and public speaking will help other people who are struggling with PTSD.[76]

### - The Court Should Award P.O. Jimeno
### *Twenty-Five Million Dollars* in Personal Injury Damages -

The criteria established by this Court for "devastating" injury include "acute systemic trauma, injuries causing lasting physical effects limiting victims' mobility and activity … when claimants consciously suffered for nearly one month after the attack or were rehospitalized or placed in rehabilitation … and permanent nerve damage." ECF No. 5879, 8.

In addition, plaintiffs whose injuries are categorized as "devastating" have "typically suffered from emotional and psychological injuries, such as Post Traumatic Stress Disorder ("PTSD"), insomnia, mood swings, and nightmares … [and] also include those who suffered a concussion or lost consciousness for approximately one week." ECF No. 5879, 9.

Measured against these standards, Officer Will Jimeno's injuries should be categorized as "beyond devastating" for a number of reasons.

First, as a result of permanent nerve and muscle damage to Will's left leg, Will is permanently disabled. He cannot walk or even stand for any extended period of time, and on seemingly random occasions his left leg will sometimes simply give out altogether. He therefore

---

[76] Jimeno Dec. ¶ 47.

uses a motorized scooter to get around. Because the peroneal nerve in Will's left leg is severed, he must wear a brace for the rest of his life. Moreover, because of further nerve damage, Will cannot feel the front of his left leg from the shin on down; yet, conversely, other parts of his leg are still so sensitive that if they are even lightly touched Will may pass out from the resulting excruciating pain.

Second, Will is also permanently disfigured. His left leg is severely atrophied and looks completely different than his right leg. He bears the scars of multiple surgeries and skin grafts. Moreover, there is a permanent hole in Will's left leg (about the size of a quarter) that (in Will's words) looks as if a shark had taken a bite out of him.

Third, Will was hospitalized for three months after September 11, and then undertook outpatient rehabilitation – five days a week, eight hours a day – for nearly a year after 9/11. While hospitalized, Will "flatlined" twice before being revived by his doctors, and he underwent eight separate surgeries, as well as skin graft procedures.

Fourth, Will suffers from PTSD as a result of his horrific experiences on September 11. To this day he suffers from nightmares and memories that he cannot control. In particular, Will is haunted by the memory of being pinned helplessly beneath a huge slab of concrete and watching his good friend and classmate Dominick Pezzulo be struck by falling debris and then die an agonizing death at Will's feet, all because Dominick was trying to rescue Will.

Will's PTSD has also impacted his family's life negatively, because Will developed anger issues that caused him to be cruel to and around his long-suffering wife and children.

Fifth, and perhaps most obviously, Will's experiences on September 11 were almost unimaginably painful and terrifying. In essence, both Towers of the World Trade Center fell on Will, one at a time; and then Will was trapped for thirteen hours in a hellish dark pit full of fire,

smoke, rubble, gunshots, pain, and fear – and all the while a huge slab of concrete was slowly but surely crushing the life out of his body.

All these factors place Will's injuries in the category of "beyond devastating." In terms of the "severity of the pain immediately following the injury," *O'Brien v. Islamic Republic of Iran*, *supra*, Will Jimeno's experience (and that of Sergeant McLoughlin) were almost uniquely *painful* in that Will was not "injured" at a single stroke, but rather was crushed *continuously* by what felt like the weight of "three hundred" SUV's worth of concrete for nearly *thirteen hours*.

And Officer Jimeno's experiences were also almost uniquely *terrifying* in that for thirteen straight hours Will faced one circumstance after another – including the fall of each Tower, gunshots rattling around his head, fire spreading into the pit where Will was trapped, the concern that no one would ever find him, the possible collapse of the pit, and the constant worsening toll that his injuries were taking on his body – each of which led Will to fear (with very good reason) that he was about to die a terrible death.

Plaintiff Jimeno further respectfully submits that – much as in the case of Edwin and Grace Rivera, *supra* – an upward departure beyond the presumptive award for "devastating" injuries is also appropriate for Officer Will Jimeno because Will's experience was a *shared* one. Will suffered not only his own pain and fear. He also suffered because:  a) his friends and fellow Officers Antonio Rodriquez and Christopher Amoroso were killed close by Will when the North Tower collapsed; b) his good friend and classmate Officer Dominick Pezzulo was killed right by Will's side by the collapse of the South Tower while Dominick was trying to dig Will out of the rubble; and c) his Sergeant and valued mentor, John McLoughlin, was also buried near Will's feet and was in imminent danger of dying throughout Will's thirteen hour ordeal (and beyond).

69

For all these reasons, plaintiff PAPD Officer William Jimeno respectfully submits that he should be awarded damages for his personal injuries in the amount of twenty-five million dollars.

**- Economic Damages in the Amount of *$3,181,931* Should be Awarded to Plaintiff Jimeno -**

Plaintiff Jimeno further respectfully submits that for the reasons set forth in the accompanying Expert Report of John Beauzille, Plaintiff Jimeno should be awarded $3,181,931 in economic damages. *See* Exhibit D-3b at 67-78.

ii.   **P.A.P.D. Sergeant John McLoughlin**

John McLoughlin was a veteran PAPD Sergeant and the father of four young children on September 11, 2001.[77] He led a team of young PAPD Officers (including Will Jimeno) into the burning Towers to try to save civilians there.  But first the North Tower, and then the South Tower, collapsed on Sergeant McLoughlin and his team.  John McLoughlin was trapped deep underground beneath the remains of the two Towers in a pit full of rubble.  He was pinned down by huge pieces of broken concrete for nearly twenty-four hours, unable to move any part of his body except for his left hand.  He was surrounded the entire time by darkness, smoke, explosions, and fire, and he did not know whether he would ever be found.  And, all the while, the concrete was slowly crushing his body, causing him continuous agonizing pain.

Finally, after nearly twenty four hours, John was pulled from the pit by rescue workers. He was the last uniformed officer (and the second to last person) to be rescued from the World Trade Center site alive.  He was rushed to the hospital and placed in a medically induced coma for six weeks, while the doctors struggled to keep him alive and to treat his massive crush

---

[77] *See* the accompanying Declaration of John McLoughlin dated July 29, 2022.  References to "McLoughlin Dec." are to Sergeant McLoughlin's July 29, 2022 Declaration.

injuries. The doctors performed twenty seven separate surgeries on John, as well as multiple skin grafts, while he was at Bellevue Hospital. The abductor muscles in John's hips, and other muscles in his back, hips and legs, were removed.

All in all, John was hospitalized on an inpatient basis for four months, and he undertook intensive full time rehabilitation treatment as an outpatient for the following three years. He was confined to his bed and wheelchair for the first two years, and then slowly learned to walk again. He has required seven more surgeries over the years. Even so, the doctors have never been able to close the large, terrible-looking surgical wounds on John's hips. Those wounds remain open and must be dressed twice every day. They have also been the source of several life-threatening infections over the years.

John has permanent nerve damage and muscle loss. He cannot feel anything in either leg from the knee on down (other than occasional flares of excruciating phantom pain in his feet). His legs and back are so weak from the removal of muscle that performing even simple tasks can leave him bed-ridden. Once a vigorous, athletic man (able, for example, to rappel down one hundred and ten floors of the World Trade Center as part of his counter-terrorism training), John is now permanently disabled and dependent on his family for assistance with simple life tasks. He also suffers from PTSD.

For the reasons detailed below, plaintiff McLoughlin submits that his injuries should be classified by this Court as "beyond devastating" and that he should be awarded twenty-eight million dollars in damages for his extraordinary pain and suffering.

### – John McLoughlin's Life Before 9/11 –

John McLoughlin was born in Brooklyn and raised in Massapequa, Long Island. He went to college at Oswego State College and earned a degree in business administration. After graduating college, he became a banker at Dry Dock Savings Bank where he worked from 1975

71

to 1980.  But John always wanted to do something more for his community.  So, while he was working at the bank, he also joined the Volunteer Fire Department in Massapequa in 1975.  He served as a paramedic there until 1982.[78]

In John's view, bank work was "fine," but he still had the desire to do more.  Finally, in 1980, he gave up his job with the bank and he enrolled in the Port Authority Police Department ("PAPD") Academy.  He graduated that July and became a full-time PAPD Officer.[79]

John was assigned to the World Trade Center in 1988.  He was not working at the World Trade Center on the day of the 1993 World Trade Center bombing, but he drove a police car to the scene from the George Washington Bridge (where he was working overtime) to assist injured people that day.[80]

McLoughlin was made the Emergency Equipment Officer at the World Trade Center after the 1993 World Trade Center bombing.  He worked continuously at the World Trade from 1988 until 2000, when he was promoted to Sergeant.[81]

After his promotion, Sergeant McLoughlin was assigned to the Port Authority Bus Terminal in midtown.  Even after twenty-two years on the job, he still enjoyed working for the PAPD and looked forward to going to work every day.[82]

John married his wife Donna in 1989.  They had four children who were fifteen, eleven, nine, and four years old respectively as of September of 2001.[83]

---

[78] McLoughlin Dec. ¶ 1.

[79] McLoughlin Dec. ¶ 2.

[80] McLoughlin Dec. ¶ 3.

[81] McLoughlin Dec. ¶ 4.

[82] McLoughlin Dec. ¶ 5.

[83] McLoughlin Dec. ¶ 6.

docs-100577682.1

Before 9/11, John McLoughlin was (by his own estimate) a "pretty good weekend athlete." He ran and lifted weights. He enjoyed walking on the beach and swimming with his family. He coached Little League sports for all his children and was very active as a Boy Scout leader. (Each summer he spent a week as a Boy Scout leader at Scout Camp in the Adirondacks; John was the only adult who finished the one-mile swim there.) John also kept in shape by doing chores around the house (including plumbing and carpentry) and through his antiterrorism training at work. (For example, as part of his training John rappelled one hundred and ten stories down an elevator shaft at the World Trade Center using a single rope.)[84]

In short, on September 10, 2001, Sergeant John McLoughlin was forty-eight years old and in very good health, a proud member of the PAPD, and the head of a happy household.[85]

### - September 11 -

On September 11, 2001, Sergeant McLoughlin was a Police Supervisor on patrol at the Port Authority Bus Terminal when a plane flew into the North Tower of the World Trade Center. Inspector Fields, John's commanding officer, called everyone who was out on patrol to return to the Police Desk at the Bus Terminal after the North Tower was hit. John and fellow PAPD Officers went to the reserve room, and they watched the news on TV. They saw smoke and fire pouring out of the North Tower. Inspector Fields asked Sergeant McLoughlin to mobilize Officers from the command to assist at the World Trade Center. They commandeered a city bus to transport PAPD Officers to the scene. John escorted the bus in a police Suburban.[86]

John exited his car at the intersection of Church Street and Vesey Street. He saw aircraft landing gear from a major airplane lying on the ground, but he did not register the significance of

---

[84] McLoughlin Dec. ¶ 7.

[85] McLoughlin Dec. ¶ 8.

[86] McLoughlin Dec. ¶ 9.

this at the time.  John also saw huge clouds of dust and debris pouring out of the buildings, and people frantically running in all directions.  And – most horrifying of all – John saw with his own eyes people jumping out of the burning World Trade Center Towers from great heights and falling to their deaths.[87]

He ran up to West Broadway where the bus that the PAPD had commandeered was parked, and he asked for volunteers who had experience using Scott Air Packs to help with search and rescue.  PAPD officers Will Jimeno, Dominick Pezzulo, and Antonio Rodrigues volunteered.  They hurried together to the World Trade Center and entered Building 5 at Vesey Street.[88]

The four men attempted to pick up rescue equipment in the lobby of Building 5, but all the equipment was gone.  They then hurried to the Police Desk upstairs on the Plaza Level from Vesey Street Entrance.  There they did find some equipment.  They also found an empty unused canvas mail cart that they intended to use in order to hold spare air bottles and helmets.  They went from the Police Desk to the Concourse Level, and then headed from the Vesey side to Building Two in order to get more equipment.[89]

On their way to the South Tower they unexpectedly met PAPD Officer Chris Amoroso, and he joined them on the way to the South Tower.  A large number of civilians were exiting the World Trade Center on the Concourse Level.  John still recalls that at this time he saw a Police Officer "covered in the blood of a jumper" from one of the buildings.[90]

---

[87] McLoughlin Dec. ¶ 10.

[88] McLoughlin Dec. ¶ 11.

[89] McLoughlin Dec. ¶ 12.

[90] McLoughlin Dec. ¶ 13.

As the team walked from the South Tower towards the North Tower, Sergeant McLoughlin heard a huge explosion.  This was the collapse of the South Tower.  When he looked over, John saw the lobby of Building Two filled with a huge mass of brown debris and dust that was now rolling towards him like a gigantic landslide.  John thought that he and his team were going to die, and he was terrified.  But John knew from his many years of being stationed at the World Trade Center that there was a freight elevator nearby, and he yelled for everyone to run towards the elevator shaft.[91]

John was hit with heavy debris.  He curled up in a ball to minimize the blows that he was taking to his body.  Then he heard nothing - silence.  He thought he had died.[92]

John found himself in a fetal position, lying on his right side and buried underground beneath a huge mound of broken concrete and other debris.  His entire body from the hips on down was covered by pieces of concrete and rubble.  His helmet was caught in the debris in such a way that he could not move his head.  When he looked down, all he could see was concrete. He could not move any part of his body except for his left arm.[93]

Sergeant McLoughlin shouted "Sound Off!" in order to try to locate the members of his team.  Dominick Pezzulo and Will Jimeno answered back and identified themselves.  But John did not hear the others.  He thought that the other Officers had gotten separated.  But in fact Antonio Rodrigues and Chris Amoroso had been killed, likely instantly, by the collapse of the South Tower.[94]

---

[91] McLoughlin Dec. ¶ 14.

[92] McLoughlin Dec. ¶ 15.

[93] McLoughlin Dec. ¶ 16.

[94] McLoughlin Dec. ¶ 17.

docs-100577682.1

Dominick was able to pull himself free of the debris, but Will was stuck.  Dominick offered to go get help.  But John directed Dominick to free Will first, and that once Will was free, then the two of them could rescue John.  Dominick started to help Will.[95]

But then John heard another terrible rumble.  This was the collapse of the North Tower.  It sounded to John like another huge explosion.  Concrete and other debris started raining down on the three men again.  The concrete around John shifted so that it started to crush his hips and knees.  He was in terrible, terrible pain, and John thought he would not make it home to his family alive.[96]

There was a hole in the debris far above the three men, but John could not see that hole from where he was trapped.  He could still hear Will and Dominick.  Will said that Dominick had been hit by falling concrete and was now badly hurt.  John heard Dominick say that John and Will should always remember that Dominick had done his best to try to get Will and John out.[97]

Dominick then fired his weapon up into the air in the direction of the opening in the debris in a last-ditch effort to alert someone to come rescue the three men.  A short time later, Dominick died – trapped in the rubble near John.  John (and Will) heard Dominick take his very last breaths.[98]

At some point, flames from burning debris started coming down into the hole where Will and John were trapped.  John expected to burn to death.  Then Dominick's weapon started firing by itself because of the fire and intense heat.  John felt sure that one of the bullets was bound to hit him in the head.  But somehow they all missed.  A short time later, John heard gunshots in the

---

[95] McLoughlin Dec. ¶ 18.

[96] McLoughlin Dec. ¶ 19.

[97] McLoughlin Dec. ¶ 20.

[98] McLoughlin Dec. ¶ 21.

distance.  He surmised that City Emergency Services Officers were engaged in a gun fight with terrorists.  But in fact ammunition in the Federal Shooting Range in Building 6 of the Trade Center was also firing off by itself due to the fire and heat.[99]

Time dragged on.  Will and John were pinned down by concrete and could not move; and they couldn't see each other either, because there was too much rubble between them .  But they continued to talk with each other in order to try to stay awake and stay alive.[100]

John was extremely dehydrated.  He was scared, and he was in severe pain.  Based on his experience as a paramedic, John understood that he was suffering from compartment syndrome caused by his crush injuries, and that Will probably was suffering from compartment syndrome too.  As the night went on, it seemed to John less and less likely that John and Will would survive.[101]

At some point John heard Will talking to someone.  But whoever it was walked away and never came back.  To this day, John does not know if that person (or those people) walked away by choice, or if instead they were killed by debris or fire.[102]

Later in the evening, John heard a man shout, "United States Marines," and the man yelled for people to call out for help.  Will shouted back that PAPD officers were down, and he begged the Marine not to walk away.  The Marine told Will that he would not leave.  John felt a surge of hope – maybe he would live to see his family after all.  There were three individuals helping Will and John — two former Marines and one civilian.  The civilian went to find more help.  He brought New York City Emergency Service Police Officers to where the Marines were

---

[99] McLoughlin Dec. ¶ 22.

[100] McLoughlin Dec. ¶ 23.

[101] McLoughlin Dec. ¶ 24.

[102] McLoughlin Dec. ¶ 25.

standing, outside the hole under which John and Will were trapped.  Then the rescue started in earnest.[103]

The rescue workers said that the space was too tight with debris to reach John, so they needed to get Will out first.  (John was now buried about twenty feet below Will.)  John was happy that Will would be rescued.  At one point Will felt that his rescue was going too slowly and that it was too dangerous to leave John trapped much longer.  Will told the rescue workers that they should amputate Will's leg so that they could then get to John more quickly.  Thankfully, Will was rescued without the rescuers having to resort to that option.[104]

It took about three hours for the rescue workers to dig Will out.  The rescue workers had to take turns crawling down to where Will was trapped.   There was heat and dust and fire all around, and John was in terrible pain the whole time.[105]

After Will was rescued, the rescue workers started trying to save John.  An Emergency Services Unit Officer treated John for compartment syndrome—an extremely painful condition that is associated with crush injuries and that can kill a person if not treated promptly – by giving John fluids through an IV.  John was given water to drink, but he was so desperately thirsty that he drank the water too fast and vomited the water back up.[106]

Once Will was rescued, it took an additional seven to eight hours for the rescue workers to get the debris off of Sergeant McLoughlin and free him.  There was a lot of fire and smoke in the area where John was trapped.  The rescue workers worked in shifts because it was too difficult to be surrounded by fire and smoke for a prolonged period of time.  They had to come

---

[103] McLoughlin Dec. ¶ 26.

[104] McLoughlin Dec. ¶ 27.

[105] McLoughlin Dec. ¶ 28.

[106] McLoughlin Dec. ¶ 29.

down to John's location one at a time by crawling through the debris, and then they needed to

crawl over John on their stomachs in order to work on getting the debris off his legs.  Each time

the rescuers moved there was danger that the hole might collapse and kill them all.  There was

also a risk that fire might burn everyone to death.  And whenever the rubble shifted against

John's body, it caused John even greater pain.[107]

John was offered morphine to help with the pain, but he refused out of fear that it would

weaken him and cause him to die.  John later learned that the rescue workers developed a plan to

amputate both of John's legs at the thigh in case that was necessary in order to free John in time

to save his life.  (Later on, when John was in his medically induced coma at Bellevue Hospital,

the doctors there again considered amputating both his legs.)  To this day, John cries when he

thinks about how his legs were almost amputated.[108]

After being buried under the rubble for approximately twenty-two hours, John was finally

pulled from the rubble at approximately 8:30 on the morning of September 12, 2001. Rescue

workers manually pulled John up out of the hole with a rope, and then placed him on a "Stokes

Stretcher" made out of metal and plastic.  The rescue workers constructed a series of bridges

made out of plywood and slid John down the pile of rubble out to the street.  An ambulance was

waiting there to take him to Bellevue Hospital. [109]

---

[107] McLoughlin Dec. ¶ 30.

[108] McLoughlin Dec. ¶ 31.  *See also* B. Raynovich, "Crushed", *Journal of Emergency Medical Services*, Aug. 31. 2006 (included within Ex. A to McLoughlin Dec.). (Notably, as set forth in the "Crushed" article, while Sergeant McLoughlin does not recall receiving morphine while trapped in the rubble, the physician and EMT who attempted to treat him at that time report that they did administer morphine, and they further detail the plans they made to amputate the Sergeant's legs if necessary to free him).

[109] McLoughlin Dec. ¶ 32.  Attached as Exhibit A to the accompanying Declaration of John McLoughlin are several news articles about Sergeant McLoughlin's experiences.

John had been in excruciating pain from the time the North Tower collapsed until he was rescued the following morning.  He was given morphine in the ambulance, and then he lost consciousness.[110]

Five men from the PAPD – Will Jimeno, Antonio Rodrigues, Dominick Pezzulo, Chris Amoroso and Sergeant McLoughlin himself – ran into the Concourse on September 11, trying to save people's lives.  Of those five men, Antonio and Chris were killed when the South Tower fell.  Dominick, Will and McLoughlin survived the collapse of the South Tower, but they were trapped – buried alive under a huge mountain of rubble created by the remains of the South Tower.  Dominick was able to briefly free himself.  But then he was too killed while trying to save Will when the North Tower fell on the men as well.  Will was rescued on the evening of September 11.  And, finally, Sergeant McLoughlin was rescued on the morning of September 12, after enduring the unendurable for nearly twenty-four hours.  Sergeant John McLoughlin was the last uniformed officer, and the second to last person, to be rescued alive from the World Trade Center.[111]

### - The Hospital Saves John's Life -

When John first arrived at Bellevue Hospital, his organs were failing due to the injuries he had sustained in the attacks.  He was suffering from massive crush injuries.[112]

The doctors told John's wife that they did not know whether he would survive.  They put John into a medically induced coma, during which John was placed on a ventilator in the intensive care unit ("ICU").  John's wife and children did not know whether he would live or die.  Once, when things looked particularly grim, he was given last rites and the doctors told John's

---

[110] McLoughlin Dec. ¶ 33.

[111] McLoughlin Dec. ¶ 34.

[112] McLoughlin Dec. ¶ 35.

wife to bring his children to see him one last time.  John remained in his medically induced coma for six weeks.[113]

John had a total of twenty-seven surgeries while at Bellevue, as well as numerous blood transfusions.  He had multiple debridement surgeries to remove dead tissue from his body.  The doctors removed the abductor muscles on both of John's hips, as well as other muscle tissue from his back, hips and legs.  The doctors also placed skin grafts on major areas of John's back and legs, from the hip down to the ankle.  An artery in John's left calf burst, necessitating reconstructive surgery for that calf.[114]

The doctors in the hospital consulted with retired military doctors (who had experience closing battle wounds) concerning their efforts to close John's leg wounds.  Yet, to this day, the doctors have not been able to close all John's wounds.  He still has large open surgical wounds on both hips.[115]

John finally woke up from his medically induced coma right before Halloween of 2001.  He had survived.  But he was still in horrible pain.  Changing the dressing on his wounds was particularly agonizing.[116]

While he was at Bellevue, Sergeant McLoughlin was diagnosed with and treated for:

- crush injuries to bilateral lower extremities and bilateral buttocks,

- bilateral gluteal compartment syndromes,

- rhabdomyolysis secondary to crush injury to bilateral lower extremities, and bilateral buttocks and bilateral gluteal compartment syndromes,

---

[113] McLoughlin Dec. ¶ 36.

[114] McLoughlin Dec. ¶¶ 37-38.

[115] McLoughlin Dec. ¶ 39.

[116] McLoughlin Dec. ¶ 40.

- acute tubular necrosis/acute renal failure secondary to rhabdomyolysis, secondary to crush injury to bilateral lower extremities and bilateral buttocks and bilateral gluteal compartment syndromes,

- pseudomonas septicemia and septic shock,

- acute respiratory failure and ventilatory dependence,

- myonecrosis secondary to crush injury to bilateral lower extremities and bilateral buttocks and bilateral gluteal compartment syndromes,

- bilateral sciatic nerve palsies,

- coagulopathy including thrombocytopenia secondary to pseudomonas septicemia and septic shock,

- bacterial pneumonia, and

- anemia.[117]

On November 30, 2001, John was transferred from Bellevue to the Helen Hayes Hospital in West Haverstraw, New York, so that his hospital treatment could continue at a location more convenient to his family and because Helen Hayes is an especially good hospital for occupational and physical therapy. He remained hospitalized as an inpatient at Helen Hayes until the second week of January 2002.[118]

### - Outpatient Treatment -

Next, John underwent outpatient treatment at Helen Hayes Hospital – five eight-hour days per week, for three years.[119]

---

[117] McLoughlin Dec. ¶ 41.

[118] McLoughlin Dec. ¶ 42.

[119] McLoughlin Dec. ¶ 43.

At Helen Hayes, John undertook occupational therapy, physical therapy, and wound care. The first step in John's rehabilitation was to teach him how to sit up again. This was a considerable struggle that lasted several months. Over time, among other things, the therapists taught John how to perform daily tasks as a disabled person, how to treat his wounds, and how to break down scar tissue in his body so as to increase his flexibility.[120]

John was confined to his bed and to a wheelchair for the first two years of his outpatient treatment. He needed to be driven to his treatments by a PAPD Officer. This saddened John because he was accustomed to being "independent and providing for [his] family." During the final year of his outpatient treatment, John walked with a cane and then, at the end of that third year, he was able to walk without assistance.[121]

John has had seven surgeries since he left Bellevue during which the doctors have attempted to close the wounds on both his hips. Unfortunately, these surgeries have been only partially successful. To this day, John has large open surgical wounds on both hips. He performs dressing changes to those wounds twice each day.[122]

Because of the open wounds on his hips, John also developed bone infections in both his left femur and right hip. He needed to see an infectious disease specialist for treatment of those bone infections for several years. On two occasions he was required to undertake intravenous infusions of antibiotics at the hospital in order to treat those infections – seven days a week, for six weeks at a time on each occasion.[123]

---

[120] McLoughlin Dec. ¶ 44.

[121] McLoughlin Dec. ¶ 45.

[122] McLoughlin Dec. ¶ 46.

[123] McLoughlin Dec. ¶ 47.

John has also developed chronic rhinosinusitis as a result of the attacks and his exposure to fire, smoke and dust on September 11.  This condition causes John to cough, choke and gag to the point of almost blacking out at times.  He has had two sinus operations, and he has seen a sinus specialist on a continuous basis since 2017 to deal with his rhinosinusitis.  (Attached as Exhibit B to Sergeant McLoughlin's Declaration are true and correct copies of medical records related to injuries that John sustained in the attacks.)[124]

### - John's Continuing Disability -

John's legs and back are disfigured and deformed as a result of the injuries he sustained on September 11th.  His legs and lower back are badly scarred from numerous skin grafts and surgeries.  And his legs and back have not recovered or regained their original strength (or anything close to it) because so much muscle tissue was removed.  (Attached as Exhibit C to the McLoughlin Declaration are true and correct copies of photos of John's legs and back. WARNING: THESE PHOTOS ARE VERY GRAPHIC.  In particular, these photos show how bad the open wounds on John's hips look and how his back appears to be missing pieces.)[125]

John has permanent nerve damage, and as a result he has no feeling in either leg from the knee on down.  He needs to wear plastic braces on both his legs.  He cannot either sit down or stand for long periods of time.  Bending is extremely difficult and painful for John.  It requires a lot of energy and leaves him exhausted.[126]

Because so much muscle tissue was taken out of John's back, hip, and leg, it takes great effort for him to do even simple tasks.  He needs to constantly stop and rest.  A task that used to take John an hour to perform can take all day now.  For example, after John runs a short errand

---

[124] McLoughlin Dec. ¶ 48.

[125] McLoughlin Dec. ¶ 50.

[126] McLoughlin Dec. ¶¶ 51-53.

docs-100577682.1

(like going to the Post Office), he is often bed-ridden for the rest of the day.  And (because skin grafts do not have sweat glands) John's body retains heat, which is very uncomfortable when the weather is hot.[127]

John cannot exercise.  When he has attempted to use the elliptical machine, his wounds tore even further open.  He experienced a hernia when he attempted an upper body workout.  He can no longer walk on the beach, except with great difficulty.  He cannot swim in a lake or in the ocean because that would likely re-infect his wounds and possibly kill him.[128]

John lives with constant pain in his legs and back, and that pain grows even worse whenever he attempts even minor daily tasks.  And – although John has no feeling below his knees – because of the nerve damage he has suffered, on seemingly random occasions he still experiences what he terms "lightning bolts" of excruciating phantom pain in his feet.[129]

John's injuries from the attacks forced him to retire in 2004, and he has been unable to work since.  He is classified as completely disabled, and receives a disability pension.  John had taken the PAPD Lieutenant test prior to 9/11, and was on the promotion list at the time of the attacks.  He was promoted in 2003, but that promotion did not come in time for John to receive top pension pay.[130]

John McLoughlin is now sixty-nine years old, and he continues to struggle with the fact that he is permanently disabled.  Before 9/11, he worked hard at a job that he loved, and he was

---

[127] McLoughlin Dec. ¶ 54.

[128] McLoughlin Dec. ¶ 56.

[129] McLoughlin Dec. ¶ 57.

[130] McLoughlin Dec. ¶ 58.

able to provide for his family.  Ever since the attacks, his family has had to support John.  John's family continues to navigate the ways in which to help care for him.[131]

### - Psychological Effects -

John suffered, and continues to suffer, severe emotional distress as a result of the terrorist attacks.  At Helen Hayes Hospital he was diagnosed with Post-Traumatic Stress Disorder brought about by what he had experienced and witnessed on September 11, 2001.  At Bellevue Hospital, he needed to be tied down to his bed, because he had terrible nightmares.  He dreamed that people were trying kill him and he would wake up screaming.  To this day, he is haunted by memories of 9/11 that he cannot fully control.  He is troubled by the fact that his family nearly lost him, and that he almost lost his legs.  And he is in particular haunted by the circumstances leading to Officer Dominick Pezzulo's death.[132]

The most important effect that PTSD has had (and still has) on John is that it impacts his ability to control frustration and anger.  He often lashes out and his wife and children (and others), and they have had to suffer as a result.  John and his family do their best to manage his condition, understanding that PTSD is a lifelong condition that can be managed but never truly "cured."[133]

Before 9/11, John was a healthy, happy, vigorous and physically active man.  All that was completely changed by 9/11.  It has been challenging for John to live as a disabled man – hard for John to be unable to run around with his kids like he used to, and hard to know that he

---

[131] McLoughlin Dec. ¶ 59.

[132] McLoughlin Dec. ¶ 61.

[133] McLoughlin Dec. ¶ 62.

simply cannot do most of the things that he used to enjoy.  He feels that he no longer the same person that he was before September 11.[134]

### - The Court Should Award Sergeant McLoughlin
### *Twenty-Eight Million Dollars* in Personal Injury Damages -

Consistent with the framework crafted by this Court for evaluating damage claims for personal injuries suffered as a result of the September 11 attacks, Sergeant McLoughlin's injuries can only be categorized as "beyond devastating" for at least five reasons.

First, John McLoughlin is permanently disabled.  His legs, back and hips have never recovered their strength.  He can neither sit down nor stand up for extended periods of time.  He has no feeling from his knees to his toes.  He will have to wear braces on his legs for the rest of his life.  He experiences constant pain in his legs and back.  The surgical wounds on his hips have never closed and must be dressed twice a day.  Even simple tasks are exhausting for John and often leave him bed ridden for the day.

Second, John is permanently disfigured by the large (and grotesque) open wounds on his hips and by the many scars and wounds he bears from multiple surgeries and skin grafts.  *See* McLoughlin Dec., Ex. C)

Third, John's partial recovery has required extensive – indeed, Herculean – medical treatment.  He was initially placed in a medically induced coma for six weeks.  He underwent a total of twenty-seven surgeries while at Bellevue, received extensive skin grafts there, and received numerous blood transfusions as well.

John was not released from the hospital for four months, and he then undertook outpatient hospital treatment – five eight-hour days per week – for three years.  He was confined

---

[134] McLoughlin Dec. ¶ 60.

to his bed and wheelchair for two years.  He endured seven more surgeries on his legs after

leaving Bellevue, and developed serious bone infections because of his leg wounds.  He has also

undergone two sinus surgeries to treat the extensive injuries to his sinuses caused by his

exposure to fire, smoke and dust on September 11.

Fourth, Sergeant McLoughlin has suffered and continued to suffer from PTSD as a result

of the September 11 attacks.  He struggles with the memories of his horrible experiences on that

day.  John is in particular haunted by the death of Office Dominick Pezzulo who John had

directed to stay with and to try to free Officer Will Jimeno from the rubble – rather than to go

seek additional help – a decision that helped lead to Dominick's terrible and painful death.

Fifth (and almost self-evident), John McLoughlin's experiences on September 11 (and on

into the morning of September 12, 2001) were perhaps uniquely terrifying and painful.  In

essence, both Towers of the World Trade Center fell on John and on Will Jimeno, one at a time.

Then John was trapped for nearly twenty-four hours deep underground, under a huge pile of

concrete and rubble.  For nearly an entire day and night, a huge slab of concrete was slowly

crushing the life out of John McLoughlin.  He was beset by darkness, fire, smoke, gunshots and

terrible pain throughout.  He was in great danger of being killed by fire or by the rubble

collapsing at every moment.  And he did not know whether he would ever be found.

All these factors place Sergeant McLoughlin's injuries in the category of "beyond

devastating."  In particular, Sergeant McLoughlin's ordeal was especially harrowing because

(like Officer Jimeno) McLoughlin was not injured at a single stroke.  Rather, he was injured

painfully and *continuously* for nearly twenty-four hours by a massive slab of concrete that was

slowly and painfully crushing and killing him.  (And John McLoughlin's ordeal was eight hours

longer than even Will Jimeno's.)  Sergeant McLoughlin was the last uniformed officer (and the

88

second to last person) to be rescued alive from the World Trade Center, and the suffering he endured until he was rescued was virtually unparalleled.

Further, Sergeant McLoughlin's experience was almost uniquely terrifying because for nearly twenty-four hours, through one horror after another, John McLoughlin was *continuously* faced with the prospect of an imminent and horrible death.

Moreover, as with P.O. Jimeno (and as with Edwin and Grace Rivera, *supra*), John McLoughlin's experiences were also especially horrible because they were *shared*. Four younger PAPD Officers followed Sergeant McLoughlin into the World Trade Center that day, trusting in John's experience and leadership. Two of those Officers – Officers Rodriguez and Amoroso – were killed when the South Tower collapsed on the group. One Officer – Dominic Pezzulo – was killed, down beneath the rubble and just a few feet away from John, while obeying John's order to try to free Officer Jimeno. And one Officer – Will Jimeno – spent almost thirteen agonizing hours buried deep in the rubble close by Sergeant McLoughlin, as they struggled to keep each other awake and alive by talking with one another.

For all these reasons, Plaintiff John McLoughlin respectfully submits that the Court should award Sergeant McLoughlin twenty-eight million dollars in damages for his extraordinary pain and suffering and personal injuries.

### <u>- Economic Damages in the Amount of *$2,660,711* Should be Awarded to Plaintiff McLoughlin -</u>

Plaintiff McLoughlin further submits that for the reasons set forth in the accompany Expert Report of John Beauzille, Sergeant McLoughlin should be awarded $2,660,711 in economic damages. *See* Exhibit D-3b at 114-125.

### e.  Punitive Damages

Moving Plaintiffs are also entitled to punitive damages under the FSIA.  28 U.S.C.

§ 1605A(c)(4).  In the *Havlish* Report and Recommendation on damages, the magistrate judge

explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising

out of' terrorist attacks."  ECF No. 2618 at 13 (quoting *Estate of Bland v. Islamic Republic of

Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)).  This Court adopted that recommendation and

awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive)

to 1 (compensatory).  ECF No. 2623 at 2.  The Court has applied that ratio to awards for

plaintiffs in other related cases.  *See, e.g.*, ECF No. 3175 at 3 (Magistrate Judge Maas Report and

Recommendation to apply a 3.44 punitive multiplier); ECF No. 3229 at 1 (Judge Daniels

adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier);

ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in

*Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001*

multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for

punitive damages be denied without prejudice.  ECF No. 3363 at 28.  Judge Daniels adopted

Magistrate Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs'

request for punitive damages.  ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive

damage issues until a later stage of the litigation, Plaintiffs herein request permission to address

the issue of punitive damages at a later date.  *See, e.g.*, ECF No. 3666 (Judge Daniels' Order in

*Burnett*, authorizing plaintiffs to make an application for punitive damages at a later date

consistent with any future rulings of the Court).

### f.   Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001, until the date of judgment.  ECF No. 2618 at 13-14.  This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101); *In re Sept. 11 Litig.*, 802 F.3d 314, 343 (2d Cir. 2015).  In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest.  *Id.*  Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as

opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' claims related to the September 11th Attacks.  *Id.*

However, Magistrate Judge Netburn recently recommended in *Hoglan* that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF No. 3363 at 28-29.  Judge Daniels adopted Magistrate Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims.  ECF No. 3384 at 6.  Thereafter, in *Burnett/Iran II*, the Court again awarded prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in *Hoglan* and *Burnett*, applying the 4.96 percent rate to prejudgment interest, the Moving Plaintiffs respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001, until the date of the judgment.

## V.    CONCLUSION

For all of the reasons herein, in the papers previously submitted to this Court in support of damages against Iran in this MDL, and as previously decided by this Court, the Plaintiffs respectfully request that this Honorable Court enter an order:

### a.  Liability

First, for all of the reasons herein the *King* Plaintiffs respectfully request that the Court grant the *King* Plaintiffs' motion for entry of judgment by default as to liability against Iran as to all Plaintiffs' claims under Section 1605A(c) of the FSIA and enter an order in the form submitted herewith, which tracks the language and format of the Order of Judgment issued in *Havlish, et al. v. bin Laden, et al.*, 1:03-cv-09848 (GBD) (*see* 03 MDL 1570, ECF No. 2516), as the Court directed the plaintiffs in *Hoglan*, *O'Neill*, *Federal Ins.*, and *Ashton* to do.  *See* ECF

92

No. 3004.  Plaintiffs further respectfully reserve their rights to seek judgment on other causes of action which have not otherwise been addressed by the Court in the future, if necessary.

In addition, the *King* Plaintiffs are seeking a judicial determination that service was properly effectuated upon Iran in accordance with 28 U.S.C. § 1608.

### b.  Damages

Further, for all of the reasons herein, the Goldman Declaration, in the papers previously submitted to this Court in support of damages against Iran in this *MDL*, and as previously decided by this Court, the moving plaintiffs respectfully request that this Honorable Court enter an Order:

(1)    determining that service of process was properly effected upon Iran in accordance with 28 U.S.C. § 1608(a) for sovereign defendants and 28 U.S.C. § 1608(b) for agencies and instrumentalities of sovereign defendants;[135] AND,

(2)    awarding the Plaintiffs identified in Exhibits A judgments against Iran as to damages in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, *O'Neill*, and other cases; AND,

(3)    awarding solatium damages to those Plaintiffs identified in Exhibits A in the amounts of $12,500,000 per spouse, $8,500,000 per parent, $8,500,000 per child, and $4,250,000 per sibling, as set forth in annexed Exhibits A; AND,

(4)    awarding compensatory damages judgment to the Personal Injury Plaintiffs identified in Exhibit G against Iran for pain and suffering commensurate with the injuries sustained during the September 11, 2001 terrorist attacks, in accordance with

---

[135] This only applies for the plaintiffs in this motion in the above-referenced 2018 matters, and for all plaintiffs in *Susan M. King, et al. v. Islamic Republic of Iran*, No. 1:22-cv-05193 (GBD) (SN).

prior precedent in the U.S. District Court for the District of Columbia in similar cases (and factoring in an upward departure on damages values based on the indelible impact of the September 11, 2001 terrorist attacks); AND,

(5)     awarding the estates of the 9/11 decedents, through the personal representatives and on behalf of all survivors and all legally entitled beneficiaries and family member of such 9/11 decedents, as identified by the Plaintiffs set forth in Exhibits B, compensatory damages for pain and suffering in the same per estate amount previously awarded by this Court regarding other estates of decedents killed in the September 11th attacks, as set forth in Exhibits B; AND,

(6)     awarding compensatory damages to certain Plaintiffs identified in Exhibits B for decedents' pain and suffering in an amount of $2,000,000 per estate, as set forth in annexed Exhibits B; AND,

(7)     awarding the estates of the 9/11 decedents, through their personal representatives and on behalf of all survivors and all legally entitled beneficiaries and family member of such 9/11 decedent, as identified in Exhibits B, and the Personal Injury Plaintiffs identified in Exhibit G, an award of economic damages in the amount as set forth in Exhibits B and Exhibit G; AND,

(8)     awarding the Plaintiffs identified in Exhibits A, Exhibits B, and Exhibit G prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; AND,

(9)     granting the Plaintiffs identified in Exhibits A, Exhibits B, and Exhibit G permission to seek punitive damages, economic damages, and other appropriate damages, at a later date; AND,

94

(10)     granting permission for all other Plaintiffs in these actions not appearing in Exhibits A, Exhibits B, and Exhibit G to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND,

(11)     granting to the Plaintiffs in Exhibits A, Exhibits B, and Exhibit G such other and further relief as this Honorable Court deems just and proper.

Dated:     New York, New York          Respectfully submitted,
           May 18, 2023

                                       /s/ Jerry S. Goldman
                                       ANDERSON KILL P.C.
                                       Jerry S. Goldman, Esq.
                                       Bruce E. Strong, Esq.
                                       Alexander Greene, Esq.
                                       1251 Avenue of the Americas
                                       New York, NY 10020
                                       Tel:  (212) 279-1000
                                       Fax: (212) 278-1733
                                       Email:  jgoldman@andersonkill.com
                                               bstrong@andersonkill.com
                                               agreene@andersonkill.com

                                       *Attorneys for Plaintiffs*